Kimble, Admrx., *v.* Mackintosh Hemphill
Company, Appellant.

Argued March 25, 1948. Before MAXEY, C. J., DREW,
LINN, STERN, PATTERSON, STEARNE and JONES, JJ.

*Thompson Bradshaw,* for appellant.

*Leonard L. Ewing,* with him *Reed, Ewing & Ray,* for appellee.

OPINION BY MR. CHIEF JUSTICE MAXEY, May 24, 1948:

Virginia M. Kimble, wife of decedent Harry P. Kimble, instituted two actions in trespass to recover damages sustained as a result of her husband's death allegedly caused by the roof of defendant's foundry falling upon him. The first suit was a "death action" brought by plaintiff to recover expenses and for financial loss suffered by her and her children. The second suit was a "survival action" whereby plaintiff as administratrix of decedent's estate sought to recover the present worth of Harry P. Kimble's future earnings. These were cumulative suits. The jury returned a verdict in favor of plaintiff as personal representative of decedent in the sum of $5,823.20 and in favor of plaintiff as administratrix of the estate of Harry P. Kimble in the sum of $10,000. Defendant's motion for judgment n. o. v. was denied. This appeal followed.

Defendant is the owner and operator of a plant in Midland, Pennsylvania, where it manufactures castings and other products. The main part of the plant consists of a foundry building 740 feet long, 150 feet wide, and 64 feet high, with a monitor roof. The framework of the roof consists of steel trusses to which are attached steel purlins extending from the comb of the roof to the eaves. Wooden nailers are bolted to the purlins by carriage bolts. Spiked to the purlins and extending lengthwise of the building is 2 x 6 wooden sheathing. Over this sheathing is 1 x 8 sheathing, laid crosswise of the underlying sheathing. The lower deck was spiked to the

nailers in the purlins, and the top deck was nailed to the under deck.

Plaintiff's decedent was employed by the Treadwell Construction Company as a brakeman on a "dinkey" engine used to shift railroad freight cars. On November 14, 1944, the defendant company leased to the Construction Company trackage and operating rights over a railroad siding serving defendant's plant and connecting with the Pennsylvania Railroad Company. The Construction Company agreed to move defendant's freight cars to and from its plant. These cars were moved by the engine owned by the Construction Company and operated by its employees.

Mike Rubino, who operated the engine on which decedent was brakeman, testified that about 12:30 P.M. on March 31, 1945, he heard a "tearing or ripping of boards" as he sat in the cab watching Kimble, who had left the cab, walk the length of the engine in the direction of one Boice, defendant's employee, to receive instructions regarding the movement of defendant's cars. Kimble was struck by boards and timbers falling from the roof of defendant's foundry building. Decedent died an hour later from injuries thus sustained. When the crash came, Rubino was almost struck by a piece of board. He immediately got out of the cab to look for Kimble. He testified: "I didn't spend more than ten or fifteen seconds [looking for Kimble]. I had to run, because that other roof was coming down." The first section hit the engine and the second section "hit about ten or fifteen feet away, towards the east." About three seconds elapsed between the falling of the two sections, which measured 100 feet long, 22 feet wide and weighed 12 tons.

Defendant's liability is predicated upon its failure to maintain the roof in a safe condition and in failing to inspect, discover and correct its faulty condition. Witnesses testified that the lumber in the roof was rotted. James H. Cregar, a shipping helper at Treadwell, when

asked "what was the condition of this part of roof lumber, and what not, that you found there on Harry Kimble?" replied: "Well, the roofing, why, it was good, but the other stuff was rotten." He described "the other stuff" as "heavy boards; it was rotten; there wasn't anything to it. That was one reason we didn't have any trouble getting it off of him." Charles O. Baker, another employee in the shipping department at Treadwell testified that "the lumber was in very poor condition. These two by fours that was bolted on to the purlins was very rotten, and the bolts had pulled right through the bolt holes, and the two by fours were rotted, and that is why they ripped loose in the roof. Otherwise, it wouldn't have come off like that; it probably would have busted up in different pieces, and part of it would have stuck to the roof—." When asked: "What was the condition of the two by fours, that you saw on the ground?" he answered: "Why, the bolt holes were rotted out of it."

Arthur Williams, construction superintendent for the Nellis Company, which had the job of repairing the foundry building for defendant company on April 1, 1945, made an examination of that part of the monitor from which the roof was gone and found it "in very bad shape". When questioned as to the condition of the nailers on that date, he said: "They were rotten." The bolts "were rusted away". As for the nailers and the tongue and groove in the part of the blown off roof, he stated "The nailers were not much account, at all." Mr. Williams was asked: "Could the condition of these nailers, and this tongue and groove, nailed to the nailers—have been disclosed by an inspection from the interior of that building, on March 31st, 1945, or a reasonable length of time ahead of that date?" He replied: "Yes, it could." There was other testimony of the same purport.

Defendant disclaims liability alleging (1) that the proximate cause of the fatality was a cyclonic wind of

an extraordinary intensity and that this relieved defendant from liability irrespective of whether or not its claimed antecedent negligence was a substantial factor in bringing about the harm; and (2) at the time of the accident, Kimble was either a licensee, engaged exclusively in the business of his employer, to whom no duty of inspection and repair was owed, or a statutory employee whose sole remedy was an action under the Workman's Compensation Act.

Defendant called a number of witnesses to prove that the winds at the time of decedent's injuries were of an unusually severe velocity such as had never occurred in that vicinity before and could not have been reasonably anticipated by it, and which ordinary skill and foresight could not guard against. An employee of defendant company, Erwin C. St. George, stated: "I heard a ripping and tearing sound, and an awful crash. So, we had been nervous, all morning, about the wind. It was an unusually high wind, to begin with, and the buildings around there had been swaying, and the trees, on the Crucible side were swinging back and forth, and I made everybody get out of there; and, when I got down there, I seen Mike running down." Charles H. Bryan, Chief of the Fire Department of East Liverpool, Ohio; Fred Hilditch, a resident of Midland for forty-one years; Delmar Manning, a fireman in East Liverpool for thirteen years, and Ira W. Cunningham, a policeman from East Liverpool for six years all testified that in their opinion the wind on that day was the strongest they had observed. W. S. Brontzman, employee of the U. S. Weather Bureau in charge of the Pittsburgh office, testified that at 12:28 P.M. the wind in Pittsburgh at the Allegheny County Airport (which is 30 to 35 miles from Midland) was south-south-west a velocity of thirty-eight miles per hour with fifty mile per hour gusts. At 1:00 P.M. the wind was south-southwest velocity of 38 miles per hour. At 1:28 P.M. the wind was west-southwest velocity of forty-three miles per hour. In comparing the

East Liverpool record with the Pittsburgh record, it seemed there was about an hour's difference, that is, what occurred in East Liverpool would occur in Pittsburgh about one hour later. Arthur J. LaComb, observer for the U. S. Weather Bureau stationed at the Airport at East Liverpool, Ohio, stated that at twelve-twenty seven the wind was west-southwest with a velocity of thirty-five miles with gusts up to sixty-five miles per hour.

Plaintiff's witnesses contradicted the evidence with regard to the severity of the wind on the date of the accident. Mr. Cregar was asked: "What was the condition of the weather, in Midland, about a quarter to one, or thereabouts, on the 31st day of March, 1945, in the vicinity of those two plants, Treadwell and Mackintosh Hemphill? He answered: "Well, in my judgment—you are referring to the wind, is that what you are referring to? Q. All right; let's go to the wind. A. To my judgment, the wind wasn't any stronger, at the time I went out there, then it was several times that I have seen it around that vicinity, before." He added: "There was a high wind . . . I have seen winds just as heavy as that."

Defendant contends that the court erred in submitting the question of negligence to the jury and should have declared as a matter of law that an act of God was responsible for Kimble's death. Whether or not the fatal injury to plaintiff's decedent was due to an act of God or to defendant's negligence was a question of fact for the jury. The condition of the roof, the intensity of the wind on the date of the accident and on previous occasions at the same place were factual questions. The charge of the court was comprehensive and accurate. The trial judge charged: "It is the law that no person is answerable for what is termed an act of Providence, that is, if some visitation of Providence comes along that in our ordinary experience we are not . . . anticipating, then no one can be held to answer for that act, so that if the wind on this day was of such severity that it could

not be reasonably anticipated by the Defendant, and that by reason of that wind, a part of the roof was blown off, then the Defendant would not be liable. However, if the storm were not of that severity, if it were only such a storm as occasionally happens, but is reasonably to be anticipated on occasions of every year or two, then that would not be an act of Providence . . . if they were such as were reasonably to be expected to occur occasionally, then such storms should be guarded against. An act of Providence as related to cases of injurious negligence is one against which ordinary skill and foresight is not expected to provide. Whether the injury in this case is attributable to such a cause or is the consequence of negligence is a question of fact for you to determine. . . . Even if, with an extraordinary wind or storm there is concurring negligence, the party chargeable with it will be relieved from liability if the wind or storm is so overwhelming in character that it would of itself have produced the injury complained of, independently of negligence if there were negligence."

In *Sakach et ux. v. Antonoplos*, 298 Pa. 130, 148 A. 58, this Court said: "Where there is sufficient evidence upon which a jury may found a verdict, the question should be submitted to them and it is error in such case to grant a non suit: Lehman v. Kellerman, 65 Pa. 489. The test of the sufficiency of the evidence is whether the circumstances detailed are such as to satisfy reasonable and well-balanced minds that the accident resulted from the negligence of the defendant: Ferry v. P. R. T., 232 Pa. 403, 406." On review, this Court "may not consider the veracity of the witnesses, the conflict of testimony, or the weight of the evidence. These are matters exclusively for the jury": *Sakach et ux. v. Antonoplos*, supra. Although individuals are not required to guard against every risk they conceive to be possible, they are under a legal duty to prevent hazards which they can forecast as possible. There must be antecedent probability. An act which may be prevented by the exercise of ordinary

care is not an act of God since the latter is a casualty not due to or in any way contributed to by human agency. In *Pope v. Reading Company*, 304 Pa. 326, 156 A. 106, this Court said: "Negligence has been often and authoritatively defined as 'want of care under the circumstances'. The word 'circumstances' is comprehensive. It embraces the entire sum of the attendant facts, including the operation of the forces of nature so far as they bear upon or relate to the happening of the central event. A person is charged with ordinary knowledge of the workings of these forces, and his conduct, if it is to escape being stigmatized as wanting in care, must conform to the normal workings of the forces of nature. At common law it was held that every man must have some knowledge 'of the quality of his beast' (1 Hale P. S. 430) and use appropriate means to keep that beast from harming people. Public welfare requires that this same salutary rule apply to the inanimate objects in a man's possession and subject to his intelligent control." In the instant case, defendant by using ordinary diligence and attention could have prevented the serious consequences which resulted from its failure to inspect and correct the faulty condition of the foundry rooof. We said in *Fitzpatrick v. Penfield,* 267 Pa. 564, 109 A. 653: "High winds are not of infrequent occurrence, and this particular wind was termed an ordinary wind occurring three or four times in a year. It was not an unusual one and it was for the jury to find under all the evidence whether it was likely to have occurred and should have been provided against. We cannot say that the intervening cause was vis major. One who fails in his duty to remedy a defective or dangerous condition is liable for injuries resulting therefrom although the immediate cause of the injury is the wind: Schwarz v. Adsit, 91 Ill. App. 576; Moore v. Townsend, 76 Minn. 64; Sutphen v. Hedden & Sons, 67 N. J. L. 324; Meyer v. Haven, 37 N. Y. App. 194; Stehle v. Jaeger, etc., Co., 225 Pa. 348,

352. The causal connection is not broken and the original wrongdoer is liable for the injury sustained."

For any owner of a building to permit its roof and the roof's supports to become rotten and its nails or bolts rusted, as was described in this case is an omission of due care which amounts to negligence. In *Bisson v. John B. Kelly, Inc.*, 314 Pa. 99, 110, 170 A. 139, this Court said: "It is a primary *social* duty of every person to take thought and have a care lest his action result in injuries to others. This social duty *the law* recognizes and enforces, and for any injury resulting from any person's lack of elementary forethought, the law holds that person accountable. A normal human being is held to foresee those injuries which are the consequence of his acts of omission or commission which he, as a reasonable human being, should have foreseen. The question whether a person charged with negligence or negligent acts or omissions should have foreseen the injuries resulting from those acts or omissions is for the jury, if there is any credible evidence from which a reasonable conclusion can be drawn in support of the claim of neglect of duty." We also said: "All foreseeable dangers are to be considered in the solution of the problem whether the creation of the situation was a negligent act." In *McGlone v. William Angus, Inc. et al.*, 248 N. Y. 197, 161 N. E. 469, Judge CRANE of the Court of Appeals said: "Negligence is gauged by the ability to anticipate."

We agree with the conclusion of the court below that the decedent was a business visitor on defendant's premises and not a mere licensee or statutory employee. At the moment when the accident occurred, decedent was not engaged in the performance of defendant's business. It was testified that Frank Boice, defendant's shipping clerk, had indicated, by motion or otherwise, that he wanted to talk to decedent; that the engine was stopped and decedent got off for this purpose, but no

orders had been given with respect to any work for defendant. Defendant had no authority or control over decedent at that time. Section 332, Restatement of Torts, states: "A business visitor is a person who is invited or permitted to enter or remain on land in the possession of another for a purpose directly or indirectly connected with business dealings between them." As to the duty of care required of the owner of premises to a business visitor, Title E, §343, comment a, Restatement of Torts states: "Toward the business visitor, the possessor owes the additional duty to exercise reasonable care to make the land safe for the reception of his visitor or, at the least, to ascertain the actual condition of the land so that by warning the visitor thereon, he may give the visitor an opportunity to decide intelligently whether or not to accept the invitation or permission." Decedent does not come within the definition of "employee" as set forth in the Workman's Compensation Act, Act of June 2, 1915, P. L. 736, Art. I, sec. 104; June 4, 1937, P. L. 1552, sec. 1, 77 PS 22. In *McDonald v. Levinson Steel Company,* 302 Pa. 287, 153 A. 424, we said: "Where an owner contracts with another for work on his premises in furtherance of his regular business, the employment is an independent one, establishing the relation of contractee and contractor and not that of master and servant or statutory employer and employee, and a workman injured on that work is not entitled to compensation from the owner as statutory employer or master unless the relation of master and servant is established by the contract reserving control over the means of accomplishing the work as well as over the result to be accomplished:" (Citing cases) Treadwell agreed to shift defendant's railroad cars whenever desired by the latter. Frank J. Boice testified: "The boxcars were always placed, practically, by the Pennsylvania, on the outside, and, inside—." He was asked: "Now, when any cars were placed over on the siding, or

in the Mackintosh Hemphill plant, how would they be placed, by whom?" "A. The Treadwell 'dinkey'. . . . Q. When you had a boxcar to be placed, how did you go about getting it placed? A. Well, sometimes they would come past, and I would stop them and ask them." When asked: "Whenever there was occasion to place a car inside the plant, and the 'dinkey' went by, once you had given the direction to place the car in the plant, did you have anything more to do with that shift?", he answered: "No, I just told them, and they would come in and take the car out and place it on the main line, or bring it from the main line in." Nowhere does the evidence establish the relationship of statutory employer-employee.

The judgment is affirmed.

---

DISSENTING OPINION BY MR. JUSTICE PATTERSON:

The majority holds that appellant company was under a duty to anticipate, as within the realm of reasonable probability, a wind of such intensity and velocity as would tear loose a 12-ton section of roof, break it in half, and carry it over 100 feet. There is no proof of any similar occurrence and the judgment of the court below should be reversed for the reason that appellee has failed to prove a violation of duty owed to the decedent.

A section of a roof weighing 12 tons being ripped loose and carried through the air more than 100 feet is a possibility but certainly not a reasonable probability where there is no proof of a similar occurrence in or about the immediate vicinity. The event was not within the foreseeable risk of harm. The orbit of duty is determined by the reasonable foreseeable risk of harm. In *Irwin Savings & Trust Company v. Penna. R. R. Company,* 349 Pa. 278, 284, 37 A. 2d 432, Mr. Justice DREW, quoting from *South-Side Pass. Ry. Co. v. Trich,* 117 Pa. 390, 399, 11 A. 627, said: " 'To impose such a standard of care as requires, in the ordinary affairs of life, precau-

tion on the part of individuals against all the possibilities which may occur, is establishing a degree of responsibility quite beyond any legal limitations which have yet been declared.' "

Negligence does not of itself create liability. Back of the negligent act or failure to act must be sought and found a duty to the person injured, the observance of which would have averted or avoided the injury. Even though it be assumed that the roof was negligently maintained, the unusually high wind was an independent intervening force effecting an unforeseeable event for which appellant should not be held responsible. The duty extended only to reasonably foreseeable circumstances and injury which appellant could reasonably anticipate as a result of such negligence. The event which is the basis for the instant suit was clearly beyond the periphery of the duty.

The judgment of the court below should be reversed and here entered for appellant.