Suzanne W. KLEINKNECHT and Richard P. Kleinknecht, Personal Representatives of the Estate of: Drew R. Kleinknecht, Deceased, and Suzanne W. Kleinknecht and Richard P. Kleinknecht, in their own right, Plaintiffs,

v.

GETTYSBURG COLLEGE, Defendant.

Civ. A. No. 1:CV–90–1515.

United States District Court, M.D. Pennsylvania.

March 12, 1992.

Stephen M. Greecher, Jr., Lee C. Swartz, Hepford, Swartz, Menaker and Morgan, Harrisburg, Pa., for plaintiffs.

James K. Thomas, II, Thomas, Thomas & Hafer, Harrisburg, Pa., for defendant.

## MEMORANDUM

CALDWELL, District Judge.

We currently have before us the motion of defendant, Gettysburg College, to reconsider our order, dated November 1, 1991, which denied its motion for summary judgment under Fed.R.Civ.P. 56. Oral argument on the reconsideration motion was held on January 30, 1992, and the parties subsequently submitted additional legal authorities. We will evaluate the current motion under the same standard to be employed in deciding a motion for summary judgment. The latter standard was recently set forth in *Gray v. York Newspapers, Inc.*, 957 F.2d 1070 (3d Cir.1992). References to briefs and exhibits will be to those submitted in connection with the summary judgment motion.

This is a diversity action controlled by Pennsylvania law. The plaintiffs, Suzanne W. Kleinknecht and Richard P. Kleinknecht, filed this suit on their own behalf and as the personal representatives of the estate of their son, Drew R. Kleinknecht, who was a student at the College and a member of its lacrosse team. They claim that the College's negligence and that of its agents was a legal cause of their son's

death after he suffered cardiac arrest at an off-season lacrosse practice.

One of their theories of negligence is that, in connection with the College's duty of providing for the safety of its student athletes, it had to have measures in place at the practice to provide prompt treatment in case one of the students suffered cardiac arrest, even if he had no history of heart disease or any other significant illness. The College allegedly breached this duty in several ways: it did not have in place a written plan to deal with medical emergencies; it failed to insure that coaches present at practices were certified in cardiopulmonary resuscitation (CPR); it did not have student trainers or other trainers present who were certified in CPR; and it did not have communication devices such as walkie-talkies at the practice field. According to the plaintiffs, these measures would have insured a swifter response to Drew's medical emergency than actually occurred. The consequent delay in treatment was, in the view of the plaintiffs' medical experts, a substantial factor in Drew's passing, hence making the College liable for his death.

The defendant strongly attacks this theory on the element of duty. The College argues that it had no duty to protect a healthy young athlete like Drew from a fatal arrythmia. Without this duty, the College cannot be held responsible for not having coaches or student trainers at practice who were certified in CPR or for not taking other measures that would have insured a quicker response to his medical emergency. Hence, this theory of liability must fail.

The factual background to this particular aspect of the plaintiffs' case is undisputed and is as follows. Drew was a twenty year old sophomore at Gettysburg and was participating in an off-season lacrosse practice on September 16, 1988. Practice had begun at about 3:15 p.m. with jogging and stretching, some drills, and finally a six on six drill, with the team split into two groups at opposite ends of the field. Drew was a defenseman and was participating in one of the drills when he suffered his cardiac arrest. According to a teammate observing from the sidelines, Drew simply stepped away from the play and collapsed to the ground. (defendant's exhibit H, deposition of Erik Johnson, p. 10). Another teammate along the sidelines said that Drew collapsed without being struck by anyone or by any object. (doc. no. 66, affidavit of Scott Goldman). Help was summoned. Traci Moore, a student trainer, appeared. Then Joseph Donolli, the College's head trainer, arrived and he began to administer CPR. Shortly thereafter, an ambulance from Gettysburg Hospital came as well, advanced life support measures were initiated, and Drew was transported to the Hospital. Unfortunately, all measures to resuscitate him were unsuccessful and he died at about 5:00 p.m.

There was no sign that Drew was ever at risk for heart problems. In fact, the plaintiffs themselves describe him until the time of his death as "a healthy, physically active and vigorous young man," (opposition brief at p. 1), with no unusual medical history. In January of 1988, he had been examined by a physician for the College to determine his ability to participate in sports and was cleared to play lacrosse. In August of 1987, Drew's family physician had also examined him and had found him to be healthy and able to participate in physical activity. (defendant's exhibit C).

Post-mortem examinations were performed. They could not detect the reason for his fatal arrythmia. An autopsy conducted the day after Drew died revealed no bruises or contusions on the body. This fact was in accord with the evidence supplied by his teammates that he was not in the play when he suffered his arrest, and helped to dispel the notion that the arrythmia might have been caused by contact during the practice, such as with a ball or stick. As part of the autopsy, Drew's heart was sent to the National Institutes of Health for further study but no pathology was found. A subsequent examination of the autopsy records by another pathologist, and further study by a third physician after an exhumation of Drew's body, likewise did not reveal the presence of any heart

abnormality which could have explained Drew's fatal collapse.

We are thus confronted with a claim that the College had a duty to anticipate a cardiac arrest in a healthy young man showing no apparent illness whatsoever and to guard against the consequences of that possibility by having CPR trained individuals at hand or having some other way of providing treatment more promptly than he received.

Plaintiffs contend that, although no Pennsylvania court has ever ruled on a similar case, this claim is a valid one under the well established elements of a negligence cause of action and that the College owed their son a duty which it breached. Citing *Morena v. South Hills Health System*, 501 Pa. 634, 462 A.2d 680 (1983), they contend that duty depends upon the relationship between the parties at the relevant time and that there was a "special relationship," (opposition brief at p. 20), between the College and Drew based upon his status as an athlete performing in an activity supervised by College personnel. The College accordingly had to provide for his safety during this time. The plaintiffs further argue that a duty may be justifiably imposed on the College here because it was foreseeable that an athlete could suffer cardiac arrest while exerting himself in practice. In support of this contention, they rely upon the testimony of their experts that cardiac arrest is foreseeable during physical activity even in a healthy young adult. As further support for their position, they point out that Pennsylvania law does not require that the specific injury to the plaintiff be anticipated, only that a general type of harm be foreseeable. *See, e.g., Moran v. Valley Forge Drive-in Theater, Inc.*, 431 Pa. 432, 246 A.2d 875 (1968). Finally, they argue that "[o]nly when foreseeability is clearly and undeniably negated may a court rule as a matter of law that a particular defendant did not have a duty to a particular plaintiff." *Migyanko v. Thistlewaite*, 275 Pa.Super. 500, 419 A.2d 12 (1980).

For its part, the College points out that it is initially for the court to determine as a matter of law whether there is a duty. *See Burton v. Terry*, 140 Pa.Commw. 336, 592 A.2d 1380 (1991) (en banc); *Wyke v. Ward*, 81 Pa.Commw. 392, 474 A.2d 375 (1984). The defendant then analyses its duty, as the plaintiffs have done, in light of the relationship between itself and Drew but concentrates more on the foreseeability of the injury he suffered. Unlike the plaintiffs, however, the College would characterize the foreseeability of that injury as remote and highly unlikely to happen. Hence, it concludes it had no duty to provide him with the care necessary for almost immediate treatment of the emergency he suffered since only reasonably foreseeable occurrences must be guarded against, not every possible risk. *See Kimble v. Mackintosh Hemphill Co.*, 359 Pa. 461, 59 A.2d 68 (1948); *Zanine v. Gallagher*, 345 Pa.Super. 119, 497 A.2d 1332 (1985). Accordingly, since duty is an essential element of a negligence claim, *see Alumni Association v. Sullivan*, 524 Pa. 356, 572 A.2d 1209 (1990); *Wenrick v. Schloemann–Siemag Aktiengesellschaft*, 523 Pa. 1, 564 A.2d 1244 (1989), the College argues that it cannot be liable for its failure to have CPR certified coaches or trainers at the practice field, or otherwise not to have in place a way of dealing with Drew's fatal arrythmia more promptly. This particular claim must therefore fail.

The issue presented can be analyzed in different ways. The Pennsylvania Supreme Court has sometimes spoken about establishing a duty by way of the relationship between the parties, *see Morena, supra,* and at other times by relying on foreseeability coupled with considerations of proximate cause, *see Mazzagatti v. Everingham*, 512 Pa. 266, 516 A.2d 672 (1986). In other cases, it has taken a far broader approach and has said that a duty should be imposed depending upon whether "policy" dictated that result:

> In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than "the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection" from the harm suffered. *Leong v.*

*Takasaki*, 55 Haw. 398, 520 P.2d 758, 764 (1974). To give it any greater mystique would unduly hamper our system of jurisprudence in adjusting to the changing times. The late Dean Prosser expressed this view as follows: These are shifting sands, and no fit foundation. There is a duty if the court says there is a duty; the law, like the Constitution, is what we make it. Duty is only a word with which we state our conclusion that there is or is not to be liability; it necessarily begs the essential question. When we find a duty, breach and damage, everything has been said. The word serves a useful purpose in directing attention to the obligation to be imposed upon the defendant, rather than the causal sequence of events; beyond that it serves none. In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, "always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind."

*Gardner v. Consolidated Rail Corp.*, 524 Pa. 445, 454–55, 573 A.2d 1016, 1020 (1990) (quoting *Sinn v. Burd*, 486 Pa. 146, 164, 404 A.2d 672, 681 (1979)). *See also Hoffman v. Sun Pipe Line Co.*, 394 Pa.Super. 109, 575 A.2d 122 (1990).

■ In evaluating the plaintiffs' theory of negligence in light of these principles, we conclude that the defendant had no duty to anticipate and guard against a healthy student athletes's cardiac arrest that occurs in a manner unconnected to the risks of the game.

■ We believe that foreseeability is the key factor here. A duty should not be imposed, as the plaintiffs imply, just because it is possible to imagine a student having a cardiac arrest. Rather, the case law fairly establishes that a duty will be imposed only when an event is "reasonably foreseeable," *see McPeake v. William T.*

*Cannon, Esquire, P.C.*, 381 Pa.Super. 227, 553 A.2d 439 (1989); *Zanine, supra; Hoffman, supra*, 394 Pa.Super. at 116, 575 A.2d at 126 ("the mere fact that a plaintiff, or a harm, is 'foreseeable' does not resolve our inquiry"), and we understand this term to mean under Pennsylvania law an event that has some reasonable probability of occurring, not one simply within the realm of possibility. *See Kimble, supra.*

*Zanine, supra*, is illustrative and buttresses our conclusion. In that case, a police officer and his wife sued the defendant in negligence for damages allegedly arising when the officer suffered a heart attack shortly after pursuing the defendant in a high speed automobile chase which culminated in the defendant crashing his vehicle. A jury found the officer 51% negligent and the defendant 49% negligent and found for defendant under Pennsylvania's comparative negligence statute. The trial court refused to enter judgment for the plaintiffs notwithstanding the verdict or give them a new trial. On appeal, the superior court affirmed, not because the post-trial rulings of the lower court were correct, but because the evidence presented simply did not establish that the defendant owed the officer a duty and hence the plaintiffs had failed to establish negligence.

The court analyzed the duty owed in terms of the relationship of the parties and limited the scope of the duty to harm that was reasonably foreseeable. It concluded as follows:

By speeding away from appellant's squad car, appellee undeniably created a variety of risks to appellant and to others. The law clearly states, however, that appellee may be held liable only for those risks a person in his position could reasonably have foreseen. We do not believe that the risk that appellant would have a heart attack due to the stress of chasing appellee was such a risk. See W. Prosser, Law of Torts 146–47 (4th ed. 1971) (characterizing the risk that a driver might have a heart attack while at the wheel as one that would not reasonably be anticipated). Consequently, we find

that appellee owed appellant no duty of care in the circumstances of this case.

*Id.* 345 Pa.Super. at 123–24, 497 A.2d at 1334.

Similarly, in the instant case, we do not believe that Pennsylvania courts would consider the possibility of a healthy, physically active, young man having a heart attack to be so probable or having such a reasonable chance of occurring that they would place a duty upon the defendant to anticipate it and guard against its consequences.

In reaching this conclusion, we recognize that it is the opinion of the plaintiffs' experts in athletic training and in medicine that the chance of a fatal arrythmia in a young and healthy athlete was not out of the ordinary and measures should have been taken to deal with it. On this basis, the plaintiffs are arguing that the risk was indeed reasonably foreseeable. The case law settles, however, that duty is not established by expert testimony but by the court upon the consideration of many factors, including "our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall ... always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind." *Gardner, supra,* 524 Pa. at 445, 573 A.2d at 1020. In deciding that we should impose no duty here we candidly admit that our conclusion shades off into these broad areas of policy concern.

This conclusion is supported by another of the defendant's arguments. As the College has argued, and despite the plaintiffs' attempts to limit the scope of the duty, we can see no principled way of limiting the College's duty to athletic practices or contests involving student athletes who are members of the College's athletic teams. The logic of the plaintiffs' position would compel precautions at intramural games and, possibly, even at other College functions not involving physical activity. It may not be unwise to impose such a requirement but that decision should be left to the legislature. *See Alumni Association, supra.*

■ We acknowledge that it has been said that we can rule as a matter of law that there is no duty only when foreseeability is clearly and undeniably negated. *See Migyanko, supra.* We think that this statement has to be evaluated in the context of our function to determine whether a risk was reasonably foreseeable. Only when the latter determination can be made in the affirmative should the former principle come into play.

We also recognize that the record shows lacrosse to be a sport in which the players must wear padding and helmets and there is danger of being struck by a stick or ball or having other physical contact. However, despite early and reasonable speculation that one of these risks of the game was the cause of Drew's emergency, there is nothing in the record to indicate that any played a role. Hence, while the risks of the game might be important in another case, they are irrelevant here.

■ On this issue, the plaintiffs have argued that a duty may be imposed even if the particular way the injury occurred could not be anticipated. However, one of the cases cited in support of this position, *Moran, supra,* is factually distinguishable. Also, we think the plaintiffs' contention is true only if a specific injury falls within a general class of events which is reasonably foreseeable. The injury Drew suffered does not fall within such a class. As noted, it did not, for example, result from a blow suffered in the practice.

The other case cited by the plaintiffs, *Suchomajcz v. Hummel Chemical Co.,* 524 F.2d 19, 28 n. 8 (3d Cir.1975), actually supports our position in this regard since the Third Circuit stated there that the "concept of foreseeability means the likelihood of the occurrence of a general type of risk rather than the likelihood of the precise chain of events leading to the injury." In the instant case, the defendant is not saying it should be absolved because the particular chain of events could not be anticipated but because the plaintiffs have not shown that Drew's cardiac arrest was with-

in the same general type of risk that was foreseeable under the law.

We will therefore enter summary judgment in favor of the College on the plaintiffs' claim that it was negligent in failing to provide CPR trained coaches and trainers at the practice or otherwise have in place measures to deal immediately with Drew's cardiac arrest. The remaining issue for our consideration is whether the College was negligent in handling the situation after he was stricken.

The College admits that upon Drew suffering his medical emergency it had a duty of care, but it argues that the record shows that duty was satisfied. The parties have analyzed this issue broadly in terms of whether the conduct of the College's agents in meeting that duty was reasonable under the circumstances.

Both sides agree upon the basic outline of the College's response and differ only in how quickly the sequence of events in that response occurred. The following facts are undisputed. After Drew collapsed, his teammates and Head Coach, Henry Janczyk, ran to his side. Janczyk noticed, along with some of Drew's teammates, that Drew was lying so that his head appeared to be in an awkward position. No one knew precisely what had happened and a spinal injury was suspected. Janczyk concluded that Drew's condition was serious and needed attention. He directed a group of players along the sidelines to get help and he himself began to run toward Musselman Stadium, the football stadium adjacent to the practice field.

One of the players, Daniel Polizzotti, also ran toward the stadium, where a training room was located and where he knew a student trainer could be found. Polizzotti leaped a chain link fence and ran across the field, encountering student trainer, Traci Moore, outside the door to the training room. He told her a player was down on the field and that help was needed. She immediately ran toward the football stadium's main gate, managed to squeeze through a gap between one side of the locked gate and the brick pillar forming its support, and continued on to the practice field, at one point transported there partially by car. Polizzotti continued into the training room where he repeated his message to the student trainers. One of them phoned Planck Gymnasium where Head Trainer Donolli was located and he was informed of the emergency.

At the same time Polizzotti ran for help, another player, David Kerney, also ran for assistance toward the stadium. Seeing that Polizzotti was going to beat him there and that there was no point in both of them heading in the same direction, Kerney then ran for the College Union Building. He told the student at the desk of the emergency at the practice field. That student called the secretary on duty in the building and she made the call to Adams County Control which dispatched an ambulance. County records indicate that the call was received at 4:09 p.m. and an ambulance was at the scene at 4:15 p.m.

Moore reached Drew's side first. The other players noticed that Drew's breathing was strange and that his complexion was changing from flushed—which they did not consider unusual for practice—to bluish. Moore herself noted that Drew's breathing was labored and that his complexion did change while she was there. However, she simply monitored his condition, noting that he had no bruises or lacerations, but not attempting CPR or any other first aid technique.

Donolli then arrived in a golf cart at the same time as Janczyk who had entered the stadium training room, had been informed that Donolli had been notified and an ambulance called, and who then returned to the practice field. Donolli noted that Drew was not breathing, and turned him on his back to begin CPR with the assistance of a student band member, who had happened on to the scene, and who was certified as an emergency medical technician. They performed CPR until two ambulances arrived, one apparently with a basic life support system and the other with an advanced life support system. Drew was defibrillated and drugs were administered to strengthen his heart. He was placed in one of the ambulances and transported to

the hospital. He was worked on continuously but he died at about 5:00 p.m.

The defendant argues that this sequence of events indicates that it discharged any duty it had toward Drew. The College asserts that soon after Drew collapsed, Janczyk was at his side, immediately noticed that something was seriously wrong, sent some players for help and himself went for aid. These two players raced as quickly as they could to the stadium training room and the College Union Building, and immediately notified people there of the need for assistance. These people in turn without delay either rushed to Drew's side or called for an ambulance.

Polizzotti estimated that it took him no more than thirty seconds to get to the training room and the College estimates that it took Moore only about two minutes to get to Drew's side on the field. The lacrosse team was practicing on this field precisely because it was so near to the stadium training room where student trainers were located. The defendant estimates that an ambulance was present within eight to ten minutes after Drew's collapse, although it does not show how it made this calculation. The College argues that all of these measures satisfied its duty of care toward Drew.

The plaintiffs have submitted evidence which would extend the time frames involved. With the aid of an engineering firm, they have reconstructed on a map the paths taken by Polizzotti and Kerney and have estimated how long it would have taken them to get to their destinations and for their messages to be communicated to those who could be of help. They estimate that it probably took about a minute and a half for Polizzotti to get from Drew's position to the stadium training room, advise someone on duty, and have that person notify Donolli. They argue that it could have reasonably taken Kerney about two minutes and thirteen seconds to get to the College Union Building, speak to the student at the desk, and then have the secretary call Adams County Control.

The plaintiffs have also pointed to deposition testimony indicating that Drew was on the ground about a minute to a minute and a half before Janczyk ran to him and Donolli's deposition testimony that it took him about three minutes and fifteen seconds to arrive at the scene. They conclude that about six to seven minutes elapsed until Donolli began administering CPR. The plaintiffs' engineering estimates would support a time of roughly ten minutes before the ambulance appeared on the scene.

Plaintiffs argue that this was too long a time. Defendant contends that any variations in time estimates, including any others in the record, make no difference—that even accepting the plaintiffs' calculations the College still fulfilled any duty it had to Drew by way of the manner in which the coaches, trainers and students responded to his situation.

We agree with the defendant. The plaintiffs' argument was stronger when they could still assert that there was a duty of care to protect Drew from the risk of cardiac arrest but, since we have decided that it had no such duty, the actions of its agents and students subsequent to Drew's collapse were reasonable.

Hindsight might lead one to conclude that there may have been some delay in responding to his condition but, as the situation appeared to the people on the field at the time, an immediate response would not have been important. Some of the players testified that it was normal for a player to go down and stay there after some contact but this was not taken as a sign of serious illness. The player would only be composing himself. When it became apparent that something was seriously wrong, Janczyk immediately sent two players for assistance and also ran for help himself. Polizzotti and Kerney wasted no time getting to the training room and the College Union Building. Both Donolli and Adams County Control responded as swiftly as they could. Moore did not act aggressively because there was some concern about moving Drew based on a potential or suspected spinal cord injury. On this record, we conclude that the College met whatever duty it had toward Drew Kleinknecht.

The plaintiffs have argued that the delay in CPR substantially contributed to Drew's death, (plaintiffs' opposition brief, exhibit F), and, although in all cases CPR must be followed by advanced cardiac life support, they contend that CPR is most effective when administered within three to four minutes. (plaintiffs' opposition brief, exhibit A). These medical judgments may be true but unless we can attribute the delay to some negligence on the part of the College, a conclusion we have already rejected, the delay here cannot result in liability on the part of the defendant.

The plaintiffs have also criticized the actions of Janczyk and assistant coach, Donald Anderson, in supposedly keeping the other players away from Drew. They say that two of the players knew CPR but the actions of the coaches prevented them from helping Drew. This is not a relevant factor in the circumstances of this case since neither of these players volunteered to do CPR.

As additional support for their claim of negligence in dealing with Drew's collapse, the plaintiffs allege that Janczyk admitted to Richard Kleinknecht the day after his son's death that Janczyk "kind of blew it." (deposition of Richard Kleinknecht at p. 44). Further, plaintiffs' supplemental answers to interrogatories indicated that Janczyk also said at this time "that it was five minutes before he checked Drew's pulse and realized that he did not have one." (plaintiffs' opposition brief, exhibit C). Additionally, Janczyk supposedly said at the funeral that "he waited too long." (deposition of Richard Kleinknecht at p. 55).

We reject these statements as insufficiently probative of the negligence of the College. Janczyk has admitted that he did not check Drew's pulse. But he did check his breathing and began summoning assistance almost as soon as he got to Drew.

Plaintiffs have pointed to no evidence in the record which indicates that Janczyk actually delayed for minutes at a time once he got to Drew's side, and they have admitted in their own brief that the evidence shows that it could only have been a minute and a half to two minutes before he did get there. The statement that "he waited too long" must also be rejected in light of the other evidence in the record.

Plaintiffs also point to Moore's actions. Moore merely monitored Drew's condition until the arrival of Donolli. One of the plaintiffs' medical experts, Dr. Michael Brodsky, criticized this conduct. Dr. Brodsky, however, did so only in conclusional fashion. (plaintiffs' opposition brief, exhibit A). The plaintiffs' remaining medical experts were even more general and spoke more to the effects of the delay in medical treatment on the assumption that the College had a duty to provide CPR trained people from the onset of practice.[1]

 In connection with Moore's actions, the plaintiffs also rely upon the testimony of another trainer who said that Moore was very upset after the incident and told her that Anderson had not allowed her to remove Drew's face mask because he was afraid of a neck injury. Moore had wanted to check his airway and his breathing but did not do so in the way she had wanted to because of Anderson's directive. (deposition of Jennifer Olivo at pps. 13–15, doc. no. 49). Plaintiffs therefore argue that Moore "may not have truly assessed Drew's breathing." (plaintiffs' opposition brief at p. 39) (emphasis added). Nevertheless, Moore testified that she had checked Drew's breathing and while it was labored, it was regular, so we conclude that this evidence that Moore "may" not have assessed his breathing properly is not sufficient to withstand summary judgment.[2]

We will issue an appropriate order.

1. The plaintiffs' experts on athletic training were more specific in their criticism of Moore, (plaintiffs' opposition brief, exhibits C and E), but we do not see how they are qualified to render an opinion which would provide the necessary causal link between Moore's conduct and Drew's death.

2. Based upon the foregoing, we have no occasion to consider the defendant's argument that the Good Samaritan Law, 42 Pa.C.S. § 8332(a), applies here. We have reviewed the arguments of the parties, however, and we conclude that the Law could not apply to Janczyk or Anderson because they did not hold current certificates

**458**

## ORDER AND JUDGMENT

AND NOW, this 12th day of March, 1992, upon consideration of defendant's motion for reconsideration of our order, dated November 1, 1991, it is ordered that:

1. The motion is granted and our order of November 1, 1991, is vacated.

2. Summary judgment is hereby entered in favor of defendant, Gettysburg College, and against plaintiffs, Suzanne Kleinknecht and Richard Kleinknecht.

3. The Clerk of Court shall close this file.

"in first aid, advanced life saving or basic life support," as required by section 8332(b)(2). The Law would have applied to Moore, however. While there is much to the plaintiffs' argument to the contrary, but we cannot ignore the plain language of the statute which does not limit its protection to those who do not have a pre-existing duty to the injured person or who are not being compensated for their services. *See Tatum v. Gigliotti,* 583 A.2d 1062 (Md.1991). Plaintiffs' reference to another section granting immunity for uncompensated volunteers, *see* 42 Pa.C.S. § 8332.1, only highlights that the legislature could have provided a similar limitation in the Good Samaritan Law but did not. Further, the Law specifically provides protection for any "acts or omissions," 42 Pa.C.S. § 8332(a), so plaintiffs' contention that the Law does not apply because Moore did not do anything must fail. Her decision not to do anything is still covered by the Law.

We also conclude that the Law applies to the College as well since the statutory context does not "clearly indicate[ ]," [ ]," 1 Pa.C.S. § 1991, that the word "person" does not apply to corporations, *see Cutler v. Graduate Hospital,* 717 F.Supp. 338 (E.D.Pa.1989), although we agree with plaintiffs that generally a principal can still be held vicariously liable for the torts of its agent when the agent is immune from suit. *See Guffey v. Logan,* 563 F.Supp. 951 (E.D.Pa.1983) (citing *Wicks v. Milzoco Builders Inc.,* 481 Pa. 554, 393 A.2d 300 (1978). *See also Muntan v. City of Monongahela,* 45 Pa.Commw. 23, 406 A.2d 811 (1979).