989 F.2d 1360
 61 USLW 2606, 25 Fed.R.Serv.3d 65, 82
Ed. Law Rep. 43
 Suzanne W. KLEINKNECHT, Personal Representative of the
Estate of Drew R. Kleinknecht, Deceased; Richard P.
Kleinknecht, Personal Representative of the Estate of Drew
R. Kleinknecht, Deceased; Suzanne W. Kleinknecht, and
Richard P. Kleinknecht, in their own right
v.
GETTYSBURG COLLEGE, a corporation.
Suzanne W. KLEINKNECHT and Richard P. Kleinknecht, Personal
Representatives of the Estate of Drew R. Kleinknecht,
Deceased; and Suzanne W. Kleinknecht and Richard P.
Kleinknecht, in their own right, Appellants.
 No. 92-7160.
 United States Court of Appeals,
Third Circuit.
 Argued Sept. 24, 1992.
Decided March 31, 1993.
Rehearing Denied April 27, 1993.
 
 Lee C. Swartz, Stephen M. Greecher, Jr. (argued), Hepford, Swartz & Morgan, Harrisburg, PA, for appellants.
 James K. Thomas, II (argued), Paul J. Dellasega, Sarah W. Arosell, Thomas, Thomas & Hafer, Harrisburg, PA, for appellee.
 Before HUTCHINSON and ALITO, Circuit Judges, FULLAM, District Judge.*
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Suzanne W. Kleinknecht and Richard P. Kleinknecht (collectively "the Kleinknechts") appeal an order of the United States District Court for the Middle District of Pennsylvania granting summary judgment to appellee Gettysburg College ("the College"). The district court had subject matter jurisdiction under 28 U.S.C.A. § 1332(a)(1) (West Supp.1992)[1]. This Court has appellate jurisdiction under 28 U.S.C.A. § 1291 (West Supp.1992).[2] We will reverse the district court's order granting summary judgment to the College for the following reasons.
 
 I. Procedural History
 
 2
 Drew Kleinknecht died of cardiac arrest on September 16, 1988, while a student at the College and during a practice session of its intercollegiate lacrosse team. His parents filed this wrongful death and survival action against the College on August 15, 1990. The College filed an answer on September 11, 1990, and a motion for summary judgment on August 31, 1991. The district court initially denied the motion on November 1, 1991, but then granted the College's motion for reconsideration on January 9, 1992.
 
 
 3
 Following oral argument on January 30, 1992, the district court reversed its earlier decision and entered summary judgment in favor of the College on March 12, 1992. Kleinknecht v. Gettysburg College, 786 F.Supp. 449 (M.D.Pa.1992). In its opinion, the court first held that the College had no duty to anticipate and guard against the chance of a fatal arrhythmia in a young and healthy athlete. Id. at 454. The court also held that the actions taken by school employees following Drew's collapse were reasonable, and thus the College did not negligently breach any duty that might exist. Id. at 456.
 
 
 4
 In a footnote the court observed that because it had found that the College owed no special duty of care to Drew, it was not necessary to reach the question whether the immunity Pennsylvania's Good Samaritan law provides applied to any of the defendants. Id. at 457 n. 2. The court nevertheless stated that if the immunity law were applicable, Head Coach Henry L. Janczyk and Assistant Coach Donald Anderson would not be immune because neither of them held the required certification. Id. The court held, however, that student volunteer trainer Traci Moore would be shielded from liability, and that the College would also be immune because "the statutory context does not 'clearly indicate[ ]' ... that the word 'person' does not apply to corporations...." Id.
 
 
 5
 The Kleinknechts filed a timely appeal on March 25, 1992.
 
 II. Factual History
 
 6
 In September 1988, Drew Kleinknecht was a twenty-year old[3] sophomore student at the College, which had recruited him for its Division III intercollegiate lacrosse team. The College is a private, four-year liberal arts school. In 1988, it had an enrollment of about two thousand students and supported twenty-one intercollegiate sports teams involving approximately 525 male and female athletes.
 
 
 7
 Lacrosse is a contact sport. In terms of sports-related injuries at the College, it ranked at least fourth behind football, basketball, and wrestling, respectively. Lacrosse players can typically suffer a variety of injuries, including unconsciousness, wooziness, concussions, being knocked to the ground, and having the wind knocked out of them. Before Drew died, however, no athlete at the College had experienced cardiac arrest while playing lacrosse or any other sport.
 
 
 8
 In September 1988, the College employed two full-time athletic trainers, Joseph Donolli and Gareth Biser. Both men were certified by the National Athletic Trainers Association, which requires, inter alia, current certification in both cardio-pulmonary resuscitation ("CPR") and standard first aid. In addition, twelve student trainers participated in the College's sports program. The trainers were stationed in the College's two training room facilities at Musselman Stadium and Plank Gymnasium.
 
 
 9
 Because lacrosse is a spring sport, daily practices were held during the spring semester in order to prepare for competition. Student trainers were assigned to cover both spring practices and games. Fall practice was held only for the players to learn "skills and drills," and to become acquainted with the other team members. No student trainers were assigned to the fall practices.
 
 
 10
 Drew participated in a fall lacrosse practice on the afternoon of September 16, 1988. Coaches Janczyk and Anderson attended and supervised this practice. It was held on the softball fields outside Musselman Stadium. No trainers or student trainers were present. Neither coach had certification in CPR. Neither coach had a radio on the practice field. The nearest telephone was inside the training room at Musselman Stadium, roughly 200-250 yards away. The shortest route to this telephone required scaling an eight-foot high cyclone fence surrounding the stadium. According to Coach Janczyk, he and Coach Anderson had never discussed how they would handle an emergency during fall lacrosse practice.
 
 
 11
 The September 16, 1988 practice began at about 3:15 p.m. with jogging and stretching, some drills, and finally a "six on six" drill in which the team split into two groups at opposite ends of the field. Drew was a defenseman and was participating in one of the drills when he suffered a cardiac arrest. According to a teammate observing from the sidelines, Drew simply stepped away from the play and dropped to the ground. Another teammate on the sidelines stated that no person or object struck Drew prior to his collapse.
 
 
 12
 After Drew fell, his teammates and Coach Janczyk ran to his side. Coach Janczyk and some of the players noticed that Drew was lying so that his head appeared to be in an awkward position. No one knew precisely what had happened at that time, and at least some of those present suspected a spinal injury. Team captain Daniel Polizzotti testified that he heard a continuous "funny" "gurgling" noise coming from Drew, and knew from what he observed that something "major" was wrong. Other teammates testified that Drew's skin began quickly to change colors. One team member testified that by the time the coaches had arrived, "[Drew] was really blue." Appendix (App.) at 1074.
 
 
 13
 According to the College, Coach Janczyk acted in accordance with the school's emergency plan by first assessing Drew's condition, then dispatching players to get a trainer and call for an ambulance. Brief for Appellee at 8. Coach Janczyk himself then began to run toward Musselman Stadium to summon help.
 
 
 14
 The Kleinknechts dispute the College's version of the facts. They note that although Coach Janczyk claims to have told two players to run to Apple Hall, a nearby dormitory, for help, Coach Anderson did not recall Coach Janczyk's sending anyone for help. Even if Coach Janczyk did send the two players to Apple Hall, the Kleinknechts maintain, his action was inappropriate because Apple Hall was not the location of the nearest telephone. It is undisputed that two other team members ran for help, but the Kleinknechts contend that the team members did this on their own accord, without instruction from either coach.
 
 
 15
 The parties do not dispute that Polizzotti, the team captain, ran toward the stadium, where he knew a training room was located and a student trainer could be found. In doing so, Polizzotti scaled a chain link fence that surrounded the stadium and ran across the field, encountering student trainer Traci Moore outside the door to the training room. He told her that a lacrosse player was down and needed help. She ran toward the football stadium's main gate, managed to squeeze through a gap between one side of the locked gate and the brick pillar forming its support, and continued on to the practice field by foot until flagging a ride from a passing car. In the meantime, Polizzotti continued into the training room where he told the student trainers there what had happened. One of them phoned Plank Gymnasium and told Head Trainer Donolli about the emergency.
 
 
 16
 Contemporaneously with Polizzotti's dash to the stadium, Dave Kerney, another team member, ran toward the stadium for assistance. Upon seeing that Polizzotti was going to beat him there, Kerney concluded that it was pointless for both of them to arrive at the same destination and changed his course toward the College Union Building. He told the student at the front desk of the emergency on the practice field. The student called his supervisor on duty in the building, and she immediately telephoned for an ambulance.
 
 
 17
 Student trainer Moore was first to reach Drew. She saw Drew's breathing was labored, and the color of his complexion changed as she watched. Because Drew was breathing, she did not attempt CPR or any other first aid technique, but only monitored his condition, observing no visible bruises or lacerations.
 
 
 18
 By this time, Coach Janczyk had entered the stadium training room and learned that Donolli had been notified and an ambulance called. Coach Janczyk returned to the practice field at the same time Donolli arrived in a golf cart. Donolli saw that Drew was not breathing, and turned him on his back to begin CPR with the help of a student band member who was certified as an emergency medical technician and had by chance arrived on the scene. The two of them performed CPR until two ambulances arrived at approximately 4:15 p.m. Drew was defibrillated and drugs were administered to strengthen his heart. He was placed in an ambulance and taken to the hospital, but despite repeated resuscitation efforts, Drew could not be revived. He was pronounced dead at 4:58 p.m.
 
 
 19
 As the district court observed, the parties vigorously dispute the amount of time that elapsed in connection with the events following Drew's collapse. The College maintains that "Coach Janczyk immediately ran to Drew's side, followed closely by assistant coach, Anderson." Brief for Appellee at 7. Team captain Polizzotti estimated that it took him no more than thirty seconds to get from the practice field to the training room. The College contends that it took Moore no more than two minutes to get from the training room to Drew's side. In fact, the College maintains, the lacrosse team was practicing on this particular field because of its close proximity to the training room and the student trainers. The College estimates that an ambulance was present within eight to ten minutes after Drew's collapse.
 
 
 20
 The Kleinknechts, on the other hand, assert that as much as a minute to a minute and a half passed before Coach Janczyk arrived at Drew's side. Brief for Appellants at 10. With the aid of an engineering firm, the Kleinknechts constructed a map for the district court showing the paths taken by Polizzotti and Kerney, including estimates of how long it took them to arrive at their respective destinations and relay their messages to those who could be of assistance. They estimate that it took Polizzotti a minute and a half to arrive at the stadium training room from the practice field, advise someone on duty, and have that person notify Donolli. The Kleinknechts also estimate that it took Kerney two minutes and thirteen seconds to arrive at the College Union Building, speak to the student at the desk, and then have the secretary telephone for an ambulance. They point to Donolli's deposition testimony indicating that it took him approximately three minutes and fifteen seconds to arrive at the scene. The Kleinknechts further maintain, and the College does not dispute, that at least five minutes elapsed from the time that Drew was first observed on the ground until Head Trainer Donolli began administering CPR. Thus, the Kleinknechts contend that evidence exists from which a jury could infer that as long as twelve minutes elapsed before CPR was administered. They also estimate that roughly ten more minutes passed before the first ambulance arrived on the scene.
 
 
 21
 Prior to his collapse on September 16, 1988, Drew had no medical history of heart problems. The Kleinknechts themselves describe him as "a healthy, physically active and vigorous young man" with no unusual medical history until his death. Brief for Appellants at 3-4. In January 1988, a College physician had examined Drew to determine his fitness to participate in sports and found him to be in excellent health. The Kleinknecht's family physician had also examined Drew in August 1987 and found him healthy and able to participate in physical activity.
 
 
 22
 Medical evidence indicated Drew died of cardiac arrest after a fatal attack of cardiac arrhythmia. Post-mortem examination could not detect the cause of Drew's fatal cardiac arrhythmia. An autopsy conducted the day after his death revealed no bruises or contusions on his body. This corroborated the statements by Drew's teammates that he was not in play when he suffered his cardiac arrest and dispelled the idea that contact with a ball or stick during the practice might have caused the arrhythmia. The National Institutes of Health examined Drew's heart as part of the autopsy but found no pathology. A later examination of the autopsy records by a different pathologist, and still further study by yet another physician after Drew's body was exhumed, also failed to reveal any heart abnormality which could have explained Drew's fatal heart attack.
 
 III. Issues on Appeal
 
 23
 The Kleinknechts present three general issues on appeal. They first argue that the district court erred in determining that the College had no legal duty to implement preventive measures assuring prompt assistance and treatment in the event one of its student athletes suffered cardiac arrest while engaged in school-supervised intercollegiate athletic activity. Second, the Kleinknechts maintain that the district court erred in determining that the actions of school employees following Drew's collapse were reasonable and that the College therefore did not breach any duty of care. Finally, the Kleinknechts urge that the district court erred in determining that both Traci Moore and the College were entitled to immunity under the Pennsylvania Good Samaritan Act.
 
 
 24
 The following analysis addresses each of these contentions in the order presented. This Court exercises plenary review over the district court's order granting the College's motion for summary judgment. Mellon Bank Corp. v. First Union Real Estate Equity and Mortgage Invs., 951 F.2d 1399, 1404 (3d Cir.1991).
 
 
 25
 A federal court exercising diversity jurisdiction must "apply the substantive law of the state whose laws govern the action." Robertson v. Allied Signal, Inc., 914 F.2d 360, 378 (3d Cir.1990) (citing Erie R.R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938)). The parties agree that Pennsylvania law applies to the present dispute. "In cases where the state's highest court has not considered the precise question to be answered, the federal court is called upon to predict how the state court would resolve the issue should it be called upon to do so." Id. (citations omitted). Because the Supreme Court of Pennsylvania has not addressed the precise issues raised by the Kleinknechts, we must attempt to predict how that Court would rule in this case.
 
 IV. Analysis
 1. The Duty of Care Issue
 
 26
 Whether a defendant owes a duty of care to a plaintiff is a question of law. See Restatement (Second) of Torts § 328(B) (1965) (court determines whether facts give rise to any legal duty on part of defendant); accord Leedy v. Hartnett, 510 F.Supp. 1125 (M.D.Pa.1981), aff'd, 676 F.2d 686 (3d Cir.1982); Morena v. South Hills Health Sys., 501 Pa. 634, 462 A.2d 680 (1983); see also Bradshaw v. Rawlings, 612 F.2d 135, 138 (3rd Cir.1979) (negligence claim must fail if based on circumstances for which law imposes no duty of care on defendant), cert. denied, 446 U.S. 909, 100 S.Ct. 1836, 64 L.Ed.2d 261 (1980); Boyce v. United States Steel Corp., 446 Pa. 226, 285 A.2d 459, 461 (1971) (no negligence claim can be based upon facts on which law does not impose duty upon defendant in favor of plaintiff). In order to prevail on a cause of action in negligence under Pennsylvania law, a plaintiff must establish: (1) a duty or obligation recognized by the law, requiring the actor to conform to a certain standard of conduct; (2) a failure to conform to the standard required; (3) a causal connection between the conduct and the resulting injury; and (4) actual loss or damage resulting to the interests of another. Morena, 462 A.2d at 684 n. 5 (citing Prosser, Law of Torts § 30, at 143 (4th ed. 1971)).
 
 
 27
 The Kleinknechts assert three[4] different theories upon which they predicate the College's duty to establish preventive measures capable of providing treatment to student athletes in the event of a medical emergency such as Drew's cardiac arrest: (1) existence of a special relationship between the College and its student athletes; (2) foreseeability that a student athlete may suffer cardiac arrest while engaged in athletic activity; and (3) public policy.
 
 
 28
 a. Special Relationship
 
 
 29
 The Kleinknechts argue that the College had a duty of care to Drew by virtue of his status as a member of an intercollegiate athletic team. The Supreme Court of Pennsylvania has stated that "[d]uty, in any given situation, is predicated on the relationship existing between the parties at the relevant time...." Morena, 462 A.2d at 684. The Kleinknechts argue that although the Supreme Court has not addressed this precise issue, it would conclude that a college or university owes a duty to its intercollegiate athletes to provide preventive measures in the event of a medical emergency.
 
 
 30
 In support of their argument, the Kleinknechts cite the case of Hanson v. Kynast, No. CA-828 (Ohio Ct.App. June 3, 1985), rev'd on other grounds, 24 Ohio St.3d 171, 494 N.E.2d. 1091 (1986). In Hanson an intercollegiate, recruited lacrosse player was seriously injured while playing in a lacrosse game against another college. The plaintiff alleged that his university breached its legal duty to have an ambulance present during the lacrosse game. The trial court granted the defendant's motion for summary judgment based on its holding, inter alia, that
 
 
 31
 There is no duty as a matter of law for the Defendant College or other sponsor of athletic events to have ambulances, emergency vehicles, trained help or doctors present during the playing of a lacrosse game or other athletic events, and the failure to do so does not constitute negligence as a matter of law.
 
 
 32
 Id. at 10. The court of appeals reversed, concluding, "[I]t is a question of fact for the jury to determine whether or not appellee University acted reasonably in failing to have an ambulance present at the field or to provide quick access to the field in the event of an emergency." Id. at 6. By directing the trial court to submit the case to a jury, the court of appeals implicitly held that the university owed a duty of care to the plaintiff.
 
 
 33
 Although the Hanson court did not specify the theory on which it predicated this duty, we think it reached the correct result, and we predict that the Supreme Court of Pennsylvania would conclude that a similar a duty exists on the facts of this case. Like the lacrosse student in Hanson, Drew chose to attend Gettysburg College because he was persuaded it had a good lacrosse program, a sport in which he wanted to participate at the intercollegiate level. Head Trainer Donolli actively recruited Drew to play lacrosse at the College. At the time he was stricken, Drew was not engaged in his own private affairs as a student at Gettysburg College. Instead, he was participating in a scheduled athletic practice for an intercollegiate team sponsored by the College under the supervision of College employees. On these facts we believe that the Supreme Court of Pennsylvania would hold that a special relationship existed between the College and Drew that was sufficient to impose a duty of reasonable care on the College. Other states have similarly concluded that a duty exists based on such a relationship. See Beckett v. Clinton Prairie Sch. Corp., 504 N.E.2d 552, 553 (Ind.1987) (high school personnel have duty to exercise ordinary and reasonable care for safety of student athletes under their authority); Leahy v. Sch. Bd. of Hernando County, 450 So.2d 883, 885 (Fla.Dist.Ct.App.1984) (defendant school board owed duty to properly supervise spring football practice as approved school activity in which school employees had authority to control behavior of students); cf. Fox v. Board of Supervisors, 576 So.2d 978, 984-85 (La.1991) (Louisiana court had no specific personal jurisdiction over Minnesota college arising from its student's injury at rugby tournament in Louisiana where college did not (1) have rugby team in athletic department, (2) provide coach or advisor to rugby club, (3) supply club with athletic equipment or uniforms, or (4) arrange for club to participate in tournament); Benitez v. New York City Bd. of Educ., 73 N.Y.2d 650, 543 N.Y.S.2d 29, 541 N.E.2d 29, 32 (1989) (trial court erroneously instructed jury that defendant high school owed student athlete voluntarily competing in interscholastic football game same duty as prudent parent rather than lesser duty of reasonable care to protect student athletes in sports competitions from injuries arising from unassumed, concealed, or unreasonably increased risks).[5]
 
 
 34
 The Supreme Court of Pennsylvania has not specifically addressed the issue whether schools owe its athletes a duty based on that special relationship. The Supreme Court has, however, held that a university cannot be held liable for property damage incurred in a fire started by an intoxicated minor student of the university. In Alumni Association v. Sullivan, 524 Pa. 356, 572 A.2d 1209, 1211 (1990), the plaintiff alleged that the university knew or should have known that alcohol was being provided to minors in a dormitory and a fraternity house. Finding no evidence that either the fraternity or the university was involved in serving, supplying or purchasing the liquor, the Court declined to impose a duty based on a custodial relationship between the university and its students. Id. 572 A.2d at 1213.
 
 
 35
 In so holding, the Sullivan Court quoted from this Court's decision in Bradshaw v. Rawlings, on which the College relies in support of its position that it has no duty of care to its students. Bradshaw is clearly distinguishable, for the same reasons. There the plaintiff had attended a sophomore class picnic sponsored by his college. He left the picnic with another visibly intoxicated student who, while driving, was involved in an automobile accident that left the plaintiff with severe injuries. We held that the college owed no duty to the plaintiff in this situation based on a recognition that "the modern American college is not an insurer of the safety of its students." 612 F.2d at 138. We found neither the college's regulation imposing sanctions on its students for underage drinking nor its awareness in general of underage drinking by its students sufficient to impose a duty of custodial care on the college. Id. at 140-43; see University of Denver v. Whitlock, 744 P.2d 54, 61 (Colo.1987) (in banc) (university owed no duty to protect student from dangers of using trampoline located in front of fraternity house on campus).[6]
 
 
 36
 Here, unlike Sullivan and Bradshaw, Drew was not acting in his capacity as a private student when he collapsed. Indeed, the Kleinknechts concede that if he had been, they would have no recourse against the College. There is a distinction between a student injured while participating as an intercollegiate athlete in a sport for which he was recruited and a student injured at a college while pursuing his private interests, scholastic or otherwise. This distinction serves to limit the class of students to whom a college owes the duty of care that arises here. Had Drew been participating in a fraternity football game, for example, the College might not have owed him the same duty or perhaps any duty at all. There is, however, no need for us to reach or decide the duty question either in that context or in the context of whether a college would owe a duty towards students participating in intramural sports. On the other hand, the fact that Drew's cardiac arrest occurred during an athletic event involving an intercollegiate team of which he was a member does impose a duty of due care on a college that actively sought his participation in that sport. We cannot help but think that the College recruited Drew for its own benefit, probably thinking that his skill at lacrosse would bring favorable attention and so aid the College in attracting other students.
 
 
 37
 The case of Wissel v. Ohio High School Athletic Ass'n, 78 Ohio App.3d 529, 605 N.E.2d 458 (Ohio Ct.App.1992) is illustrative. There the appellant, a high school football player, was rendered a quadriplegic because of an allegedly defective football helmet. Id. 605 N.E.2d at 461. The trial court granted judgment to the appellee Athletic Association and two other defendants. Although the appellate court affirmed the order granting summary judgment, it did so because the appellant failed to " 'identify sins of commission rather than omission' " necessary to prevail under a theory of increased risk of harm, id. at 465 (quoting Patentas v. United States, 687 F.2d 707, 716 (3d Cir.1982)), not because of a lack of duty of care owed by the appellees to the student athlete:
 
 
 38
 [A]ll three appellees specifically disclaimed owing young Wissel any direct duty of reasonable care. We find it odd and disconcerting that organizations such as the appellees, which undertake to enhance the quality and safety of high school football games, disclaim that they do so to provide a service to the athletes who participate in the games. Moreover, we find similarly incongruous the argument that organizations whose rules govern the contest and whose discussions determine the type of athletic equipment that the athletes are provided do not owe those athletes a duty of reasonable care in their activities. The fact that these organizations purport to act gratuitously and for noble purposes does not, ipso facto, absolve them of a legal duty of care toward the athletes.
 
 
 39
 Id.
 
 
 40
 In conclusion, we predict that the Supreme Court of Pennsylvania would hold that the College owed Drew a duty of care in his capacity as an intercollegiate athlete engaged in school-sponsored intercollegiate athletic activity for which he had been recruited.
 
 
 41
 b. Foreseeability
 
 
 42
 This does not end our inquiry, however. The determination that the College owes a duty of care to its intercollegiate athletes could merely define the class of persons to whom the duty extends, without determining the nature of the duty or demands it makes on the College. Because it is foreseeable that student athletes may sustain severe and even life-threatening injuries while engaged in athletic activity, the Kleinknechts argue that the College's duty of care required it to be ready to respond swiftly and adequately to a medical emergency. See Blake v. Fried, 173 Pa.Super. 27, 95 A.2d 360, 364 (1953) (requiring risk "reasonably to be perceived" in order to impose duty).
 
 
 43
 Foreseeability is a legal requirement before recovery can be had. See Griggs v. BIC Corp., 981 F.2d 1429, 1435 (3d Cir.1992) (foreseeability is integral part of determination that duty exists under Pennsylvania negligence law) (citing Carson v. City of Philadelphia, 133 Pa.Cmwlth. 74, 574 A.2d 1184, 1187 (1990)). " 'The test of negligence is whether the wrongdoer could have anticipated and foreseen the likelihood of harm to the injured person, resulting from his act.' " Id. (quoting Dahlstrom v. Shrum, 368 Pa. 423, 84 A.2d 289, 290-91 (1951)).
 
 
 44
 The type of foreseeability that determines a duty of care, as opposed to proximate cause, is not dependent on the foreseeability of a specific event. See, e.g., Moran v. Valley Forge Drive-in Theater, Inc., 431 Pa. 432, 246 A.2d 875, 878 (1968) (upholding verdict for plaintiff who lost hearing when firecrackers exploded in restroom of defendant's movie theater). Instead, in the context of duty, "[t]he concept of foreseeability means the likelihood of the occurrence of a general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury." Suchomajcz v. Hummel Chem. Co., 524 F.2d 19, 28 n. 8 (3d Cir.1975) (citing Harper & James, The Law of Torts § 18.2, at 1026, § 20.5, at 1147-49 (1956)); see Griggs, 981 F.2d at 1435 (" 'The risk reasonably to be perceived defines the duty to be obeyed[.]' ") (quoting Dahlstrom, 84 A.2d at 290-91). Only when even the general likelihood of some broadly definable class of events, of which the particular event that caused the plaintiff's injury is a subclass, is unforeseeable can a court hold as a matter of law that the defendant did not have a duty to the plaintiff to guard against that broad general class of risks within which the particular harm the plaintiff suffered befell. Alumni Ass'n v. Sullivan, 369 Pa.Super. 596, 535 A.2d 1095, 1098 (1987) (citing Migyanko v. Thistlethwaite, 275 Pa.Super. 500, 419 A.2d 12, 14 (1980) and Palsgraf v. Long Island R.R., 248 N.Y. 339, 162 N.E. 99, 100 (1928)), aff'd, 524 Pa. 356, 572 A.2d 1209 (Pa.1990).
 
 
 45
 Even this determination that the harm suffered was foreseeable fails to end our analysis. If a duty is to be imposed, the foreseeable risk of harm must be unreasonable. Griggs, 981 F.2d at 1435. The classic risk-utility analysis used to determine whether a risk is unreasonable "balances 'the risk, in light of the social value of the interest threatened, and the probability and extent of the harm, against the value of the interest which the actor is seeking to protect, and the expedience of the course pursued.' " Id. at 1435-36 (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 31, at 173 (5th ed. 1984) (footnotes omitted)).
 
 
 46
 No person can be expected to guard against harm from events which are not reasonably to be anticipated at all, or are so unlikely to occur that the risk, although recognizable, would commonly be disregarded.... On the other hand, if the risk is an appreciable one, and the possible consequences are serious, the question is not one of mathematical probability alone.... As the gravity of the possible harm increases, the apparent likelihood of its occurrence need be correspondingly less to generate a duty of precaution.
 
 
 47
 Id. (quoting Prosser and Keeton, supra § 31, at 170-71 (footnotes omitted)).
 
 
 48
 Although the district court correctly determined that the Kleinknechts had presented evidence establishing that the occurrence of severe and life-threatening injuries is not out of the ordinary during contact sports, it held that the College had no duty because the cardiac arrest suffered by Drew, a twenty-year old athlete with no history of any severe medical problems, was not reasonably foreseeable. Its definition of foreseeability is too narrow. Although it is true that a defendant is not required to guard against every possible risk, he must take reasonable steps to guard against hazards which are generally foreseeable. Kimble v. Mackintosh Hemphill Co., 359 Pa. 461, 59 A.2d 68, 71 (1948). Though the specific risk that a person like Drew would suffer a cardiac arrest may be unforeseeable, the Kleinknechts produced ample evidence that a life-threatening injury occurring during participation in an athletic event like lacrosse was reasonably foreseeable. In addition to the testimony of numerous medical and athletic experts, Coach Janczyk, Head Trainer Donolli, and student trainer Moore all testified that they were aware of instances in which athletes had died during athletic competitions. The foreseeability of a life-threatening injury to Drew was not hidden from the College's view. Therefore, the College did owe Drew a duty to take reasonable precautions against the risk of death while Drew was taking part in the College's intercollegiate lacrosse program.
 
 
 49
 Having determined that it is foreseeable that a member of the College's interscholastic lacrosse team could suffer a serious injury during an athletic event, it becomes evident that the College's failure to protect against such a risk is not reasonable. The magnitude of the foreseeable harm--irreparable injury or death to one of its student athletes as a result of inadequate preventive emergency measures--is indisputable. With regard to the offsetting cost of protecting against such risk, the College prophesied that if this Court accepts that the College owed the asserted duty, then it will be required "to have a CPR certified trainer on site at each and every athletic practice whether in-season or off-season, formal or informal, strenuous or light," and to provide similar cardiac protection to "intramural, club sports and gym class." This "slippery slope" prediction reflects an unwarranted extension of the holding in this case. First, the recognition of a duty here is limited to intercollegiate athletes. No other scenario is presented, so the question whether any of the other broad classes of events and students posited by the College merit similar protection is not subject to resolution. Second, the determination whether the College has breached this duty at all is a question of fact for the jury. See Suchomajcz, 524 F.2d at 27; see also Dougherty v. Boyertown Times, 377 Pa.Super. 462, 547 A.2d 778, 787 (1988). This Court recognizes only that under the facts of this case, the College owed a duty to Drew to have measures in place at the lacrosse team's practice on the afternoon of September 16, 1988 in order to provide prompt treatment in the event that he or any other member of the lacrosse team suffered a life-threatening injury.
 
 
 50
 We also must reject the College's vigorous and lengthy argument that Drew's cardiac arrest could not have been foreseeable because his parents' encouragement to engage in athletic activity shows that Drew's death as a result of cardiac arrest while participating in athletics was not foreseeable even to them:
 
 
 51
 In response to their perception of the risk of Drew experiencing sudden cardiac arrest as negligible, the parents made no attempt to learn CPR. They made their home a beehive of athletic activity, but they made no provision to treat the rare, unpredictable circumstance presented by this case.
 
 
 52
 Had physical activity at his parents' home produced Drew Kleinknecht's heart attack, he would be just as dead.
 
 
 53
 Brief for Appellee at 21 (citation omitted). This argument is unavailing because it addresses foreseeability as relating to causation, not duty. It is not pertinent to the issue of the College's duty of care to Drew.
 
 
 54
 The Leahy court described the duty a school owes its athletes as
 
 
 55
 "[T]ak[ing] the form of giving adequate instruction in the activity, supplying proper equipment, making a reasonable selection or matching of participants, providing non-negligent supervision of the particular contest, and taking proper post-injury procedures to protect against aggravation of the injury."
 
 
 56
 Leahy, 450 So.2d at 885 (quoting Annot., 35 A.L.R.3d 725, 734 (1971) (footnotes omitted)).[7] In reversing the district court's grant of summary judgment to the College, we predict that the Supreme Court of Pennsylvania would hold that a college also has a duty to be reasonably prepared for handling medical emergencies that foreseeably arise during a student's participation in an intercollegiate contact sport for which a college recruited him. It is clearly foreseeable that a person participating in such an activity will sustain serious injury requiring immediate medical attention.
 
 
 57
 It may be that the emergency medical measures the College had in place were sufficient to fulfill this duty. It is also possible that the College could not foresee that its failure to provide emergency medical services other than those which it already had in place would substantially contribute to the death of an apparently healthy student. Nevertheless,
 
 
 58
 [W]hether in a particular case the plaintiff has demonstrated, by a preponderance of the evidence, that the defendant's negligent conduct was a substantial factor in bringing about the plaintiff's harm, is normally a question of fact reserved for the jury, and should only be removed from the jury's consideration where it is clear, as a matter of law, that reasonable minds could not differ on the issue.
 
 
 59
 Sullivan, 535 A.2d at 1098 (citing Little v. York County Earned Income Tax Bureau, 333 Pa.Super. 8, 481 A.2d 1194, 1198 (1984)).
 
 
 60
 Our holding is narrow. It predicts only that a court applying Pennsylvania law would conclude that the College had a duty to provide prompt and adequate emergency medical services to Drew, one of its intercollegiate athletes, while he was engaged in a school-sponsored athletic activity for which he had been recruited. Whether the College breached that duty is a question of fact. See Suchomajcz, 524 F.2d at 27; see also Dougherty, 547 A.2d at 787. If the factfinder concludes that such a breach occurred, we think that the question whether that breach was the proximate or legal cause of Drew's death would likewise be a question of fact.[8] Griggs, 981 F.2d at 1439 (citing White v. Rosenberry, 441 Pa. 34, 271 A.2d 341, 342 (1970) and Takach v. B.M. Root Co., 279 Pa.Super. 167, 420 A.2d 1084, 1086 (1980)); see Sullivan, 535 A.2d at 1098.
 
 
 61
 c. Public Policy
 
 
 62
 Finally, the Kleinknechts argue that the College owed a duty of care to Drew based on public policy considerations. The Supreme Court of Pennsylvania has recently announced that
 
 
 63
 In determining the existence of a duty of care, it must be remembered that the concept of duty amounts to no more than "the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection" from the harm suffered. Leong v. Takasaki, 55 Haw. 398, 520 P.2d 758, 764 (1974).... "In the decision whether or not there is a duty, many factors interplay: The hand of history, our ideas of morals and justice, the convenience of administration of the rule, and our social ideas as to where the loss should fall. In the end the court will decide whether there is a duty on the basis of the mores of the community, 'always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind.' "
 
 
 64
 Gardner v. Consolidated Rail Corp., 524 Pa. 445, 573 A.2d 1016, 1020 (1990) (quoting Sinn v. Burd, 486 Pa. 146, 404 A.2d 672, 681 (1979)). Seizing upon this language, the district court held that the College had no duty "to anticipate ... and guard against" the "possibility of a healthy, physically active, young" athlete having a heart attack while engaged in intercollegiate athletic activity, "candidly admit[ting] that [this] conclusion shades off into these broad areas of policy concern." Kleinknecht, 786 F.Supp. at 454.
 
 
 65
 Again, we believe this determination fails to distinguish duty from legal cause. It also fails to appreciate the full import of the very language upon which the district court says it relied. As already explained, two distinct theories establish that the College owed a duty of care to Drew as an intercollegiate athlete. A special relationship existed between the College and Drew in his capacity as a school athlete. His medical emergency was within a reasonably foreseeable class of unfortunate events that could arise from participation in an intercollegiate contact sport. If, as the Supreme Court of Pennsylvania has stated, the concept of duty "amounts to no more than 'the sum total of those considerations of policy which led the law to say that the particular plaintiff is entitled to protection,' " then it strengthens our belief that that Court would hold that the policies supporting these two theories are themselves sufficient to require the College to adopt preventive measures reasonably designed to avoid possible death from a life-threatening injury a recruited athlete suffers during an intercollegiate athletic activity.
 
 
 66
 Under the facts of this case, the College owed a duty to Drew to have reasonable measures in place at the practice on the afternoon of September 16, 1988 to provide prompt treatment in the event that he or any other member of the lacrosse team suffered a life-threatening injury. The determination whether the College in fact breached this duty is a question of fact for the jury. See Suchomajcz, 524 F.2d at 27; see also Dougherty, 547 A.2d at 787.
 
 
 67
 2. The Reasonableness of the College's Actions
 
 
 68
 On the duty question, it remains only for us to address the district court's second holding that the conduct of the College's agents in providing Drew with medical assistance and treatment following his cardiac arrest was reasonable.[9] The court based this determination in part, if not in whole, on its conclusion that the College had no duty to consider what emergency assistance measures would be necessary were one of its student athletes to suffer a cardiac arrest during athletic activity:
 
 
 69
 The plaintiffs' argument was stronger when they could still assert that there was a duty of care to protect Drew from the risk of cardiac arrest but, since we have decided that it had no such duty, the actions of its agents and students subsequent to Drew's collapse were reasonable.
 
 
 70
 Kleinknecht, 786 F.Supp. at 456. Thus, its holding that the College did not breach any duty was dependent, at least in part, on its holding that the College had no duty to Drew to guard against emergencies occasioned by injuries the kind students participating in lacrosse might be expected to suffer. The question of breach must be reconsidered on remand in light of this Court's holding that the College did owe Drew a duty of care to provide prompt and adequate emergency medical assistance to Drew while participating as one of its intercollegiate athletes in a school-sponsored athletic activity.
 
 
 71
 Moreover, on remand, we think the district court should be careful not to infringe on the province of the factfinder by prematurely deciding whether the College breached its duty. A district court should grant a motion for summary judgment only when the plaintiff's evidence, together with all reasonable inferences of fact arising therefrom viewed in the light most favorable to the plaintiff, is insufficient to make out a prima facie case of negligence. Dougherty, 547 A.2d at 787 (citing Watkins v. Sharon Aerie No. 327 Fraternal Order of Eagles, 423 Pa. 396, 223 A.2d 742, 743 (1966); Stenson v. Rechutti, 416 Pa. 548, 207 A.2d 760 (1965)). "Negligence is a question for the jury to determine upon proper instruction. The court should not remove the question from the jury unless the facts leave no room for doubt." Id. (citing Papa v. Pittsburgh Penn-Center Corp., 421 Pa. 228, 218 A.2d 783 (1966); Spraggins v. Shields, 310 Pa.Super. 408, 456 A.2d 1000 (1983)). These Pennsylvania authorities are in full accord with the Restatement. It concludes, "[I]n any case in which different conclusions may be reached on the issue ... whether the defendant has conformed to the standard of conduct required by the law" is a matter for the jury. Restatement (Second) of Torts § 328C(b) (1965).
 
 3. The Immunity Issue
 
 72
 Finally, we address the College's argument that Pennsylvania's Good Samaritan law provides immunity to both the College and its personnel who rendered emergency care to Drew. This statute provides in pertinent part:
 
 
 73
 (a) General rule.--Any person who renders emergency care, first aid or rescue at the scene of an emergency ... shall not be liable to such person for any civil damages as a result of any acts or omissions in rendering the emergency care, first aid or rescue ... except any acts or omissions intentionally designed to harm or any grossly negligent acts or omissions which result in harm to the person receiving the emergency care, first aid, or rescue....
 
 
 74
 (b) Exceptions.--
 
 
 75
 * * *
 
 
 76
 (2) In order for any person to receive the benefit of the exemption from civil liability provided for in subsection (a), he shall be, at the time of rendering the emergency care, first aid or rescue ... the holder of a current certificate evidencing the successful completion of a course in first aid, advanced life saving or basic life support sponsored by the American National Red Cross or the American Heart Association or an equivalent course of instruction approved by the Department of Health ... and must be performing techniques and employing procedures consistent with the nature and level of the training for which the certificate has been issued.
 
 
 77
 42 Pa.Cons.Stat.Ann. § 8332(a), (b)(2) (1982).
 
 
 78
 The Kleinknechts argue that the College waived any defense of immunity under the Good Samaritan law because it did not plead it as an affirmative defense in its answer. See Fed.R.Civ.P. 8(c) (all affirmative defenses must be pled). Failure to raise an affirmative defense in a responsive pleading, however, does not always result in waiver. Charpentier v. Godsil, 937 F.2d 859, 863 (3d Cir.1991) (citing Prinz v. Greate Bay Casino Corp., 705 F.2d 692, 694 (3d Cir.1983)). For example, a party may raise an unpled affirmative defense in an appropriate motion. See, e.g., Williams v. Murdoch, 330 F.2d 745, 749 (3d Cir.1964) (affirmative defense of res judicata properly raised in motion to dismiss under Federal Rule of Civil Procedure 12(b)) (citing Hartmann v. Time, Inc., 166 F.2d 127, 131 n. 3 (3d Cir.1947), cert. denied, 334 U.S. 838, 68 S.Ct. 1495, 92 L.Ed. 1763 (1948)).
 
 
 79
 Although the College did not assert the defense of immunity under the Act in its answer, it did raise this defense in paragraph nine of its motion for summary judgment. Even though a motion for summary judgment is not the most appropriate way to raise a previously unpled defense of immunity, we think it would be inappropriate in the present case to decide the immunity issue on the basis of waiver.
 
 
 80
 Under Fed.R.Civ.P. 15(a), a responsive pleading may be amended at any time by leave of court to include an affirmative defense, and "leave shall be freely given when justice so requires." Unless the opposing party will be prejudiced, leave to amend should generally be allowed. Moreover, under Fed.R.Civ.P. 15(c), issues tried by the express or implied consent of the parties are "treated in all respects as if they had been raised in the pleadings." It has been held that a "defendant does not waive an affirmative defense if '[h]e raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.' "
 
 
 81
 Charpentier, 937 F.2d at 863-64 (citations omitted). Here, the Kleinknechts received notice of the immunity defense when they received the College's motion for summary judgment. Like the plaintiff in Charpentier, the Kleinknechts have not claimed that they were prejudiced because the College raised this defense in its summary judgment motion rather than in its answer. The relevant facts underlying the College's claim of immunity are not in dispute, so the issue presents only a question of law for resolution. Like the district court in Charpentier, the district court here could have exercised its discretion to permit the College to amend its answer to assert the immunity defense but instead ruled on the merits of the immunity claim without deciding whether it had been waived.[10] Following the lead of Charpentier, and because both the record and the Kleinknechts' brief fail to disclose that any objection to such an amendment was preserved in the district court, this Court will consider the merits of the College's immunity claim. See id. at 864.
 
 
 82
 The parties do not dispute the district court's determination that neither Coach Janczyk nor Coach Anderson is entitled to immunity. The College, however, argues that it too is entitled to immunity because it is a "person" within the terms of the statute. In general, Pennsylvania statutory law defines the term "person" as including corporations, partnerships, and associations unless the statutory context indicates otherwise. 1 Pa.Cons.Stat.Ann. § 1991 (Supp.1992). Section 8332, however, requires a person who seeks immunity to hold certification in an approved first aid, advanced life saving, or basic life support course. We think it is unlikely that the Pennsylvania General Assembly intended that corporations could achieve the requisite certification and receive immunity. As the Kleinknechts note, the statute encourages rescue and lending assistance at the scene of an emergency. These measures can only be taken by a natural person.[11] Therefore, we reject the College's argument and predict that the Supreme Court of Pennsylvania will not hold that a corporation is entitled to immunity under the Pennsylvania Good Samaritan law.
 
 
 83
 Moreover, even if an agent such as Traci Moore is immune, the principal can still be vicariously liable. See Muntan v. City of Monongahela, 45 Pa.Cmwlth. 23, 406 A.2d 811, 813-14 (1979) (employer may be held responsible for torts of employees even if employees are immune from liability) (citing Wicks v. Milzoco Builders, Inc., 25 Pa.Cmwlth. 340, 360 A.2d 250, 253 (1976), aff'd, 481 Pa. 554, 393 A.2d 300 (1978); Restatement (Second) of Agency § 217(b)(ii) (1958)). Thus, the College may not claim immunity either in its own right or derivatively from Moore, regardless of whether she falls within the provisions of the statute.[12]
 
 V. Conclusion
 
 84
 The district court's holding that the College's duty of care to Drew as an intercollegiate athlete did not include, prior to his collapse, a duty to provide prompt emergency medical service while he was engaged in school-sponsored athletic activity will be reversed. The district court's holding that the College acted reasonably and therefore did not breach any duty owed to Drew following his collapse will likewise be reversed. We will remand this matter to the district court for further proceedings consistent with this opinion. We will reverse the district court's conclusion that the College is entitled to immunity under the Good Samaritan law.
 
 
 85
 ALITO, Circuit Judge, dissenting.
 
 
 86
 I respectfully dissent. Essentially for the reasons set out by the district court, I would hold that the facts upon which the plaintiffs relied were insufficient to establish a breach of Gettysburg College's duty to participants in its intercollegiate athletic program. See Kleinknecht v. Gettysburg College, 786 F.Supp. 449 (M.D.Pa.1992).
 
 
 
 *
 Hon. John P. Fullam, District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 This section provides in pertinent part:
 The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $50,000, exclusive of interest and costs, and is between--
 (1) citizens of different States[.]
 28 U.S.C.A. § 1332(a)(1).
 
 
 [2]
 This section provides in pertinent part:
 The courts of appeals ... shall have jurisdiction of appeals from all final decisions of the district courts of the United States....
 28 U.S.C.A. § 1291.
 
 
 [3]
 To be precise, Drew had turned twenty only one week before his death
 
 
 [4]
 The Kleinknechts assert a fourth theory of liability based upon the College's voluntary undertaking to provide certain services to its student athletes. This theory is founded on section 323 of the Restatement (Second) of Torts, which provides:
 One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject for liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
 (a) his failure to exercise such care increases the risk of such harm, or
 (b) the harm is suffered because of the other's reliance upon the undertaking.
 Restatement (Second) of Torts § 323 (1965); see Feld v. Merriam, 506 Pa. 383, 485 A.2d 742, 746 (1984) (recognizing that section 323 has been adopted as accurate statement of Pennsylvania law); Morena, 462 A.2d at 684.
 Because we resolve the duty issue by reference to the other theories argued by the Kleinknechts, we do not consider the applicability of section 323 to the facts of this case.
 
 
 [5]
 We recognize that most of these cases involve participation in sports sponsored by a public school system at the pre-college level. Arguably, the relationship between the injured participant and the sponsor is closer, and the need to import a duty based on the special nature of the relationship between a public school and its interscholastic athletes is therefore more compelling than in the case of a private college and its students participating in an intercollegiate athletic program. Here, however, we think that distinction is balanced out by Gettysburg's active recruitment of Drew to participate in its intercollegiate lacrosse program
 
 
 [6]
 Also distinguishable is Morena v. South Hills Health System. There the Supreme Court of Pennsylvania held that the defendant ambulance company had no duty to transport a shooting victim from one hospital to another when the company had no knowledge that the transfer was being requested on an emergency basis. 462 A.2d at 685. Likewise, in Zanine v. Gallagher, 345 Pa.Super. 119, 497 A.2d 1332 (1985), the court concluded that a fleeing motorist had no special duty of care towards a police officer who suffered a heart attack subsequent to the pursuit because the heart attack was not foreseeable. Id. 497 A.2d at 1334
 
 
 [7]
 We note again that this case involved participation in public school athletics at the pre-college level
 
 
 [8]
 Of course, we are unable to say what effect any additional facts will have on this case as the record is developed
 
 
 [9]
 This is a separate and distinct duty from that which the College had in terms of maintaining prompt and adequate emergency medical attention prior to Drew's collapse. The College does not dispute that a duty of care was imposed on it at the time of Drew's collapse
 
 
 [10]
 The record on appeal fails to contain any evidence that the Kleinknechts objected to the College's assertion of the immunity defense. The record contains only part of the College's motion for summary judgment and no indication of how or whether the Kleinknechts responded to it. The record likewise does not include a transcript of the hearing on the motion for summary judgment. If the Kleinknechts did not raise any objection to the College's failure to raise the immunity defense in its answer either in a responding motion or at oral argument, then they have arguably waived any such objection. This Court will therefore assume that the issue was properly preserved for appeal
 
 
 [11]
 In 1982, the Pennsylvania General Assembly passed 42 Pa.Cons.Stat.Ann. § 8332.1 (Supp.1992), which specifically addresses sports programs conducted by "nonprofit associations" and the liability of managers, coaches, umpires, and referees. That statute does not apply here because, inter alia, it applies only to programs for people under age eighteen. Nevertheless, the fact that the General Assembly specifically provided immunity for nonprofit corporations in that statute, see id. § 8332.1(d) (defining "nonprofit associations"), but did not explicitly do so in § 8332, further supports the conclusion that the term "person" in § 8332 does not include a corporation
 
 
 [12]
 The Kleinknechts argue that immunity should not be extended to Traci Moore because at the time she rendered care to Drew she acted within the scope of her employment. Whether Moore is entitled to immunity under the Good Samaritan law is irrelevant because she is not named as an individual defendant. Her actions or omissions are pertinent to this case only insofar as they could establish or refute the College's vicarious liability, which is not dependent on her immunity status under the statute