**M.B., A Minor, by and Through Her Parent and Natural Guardian, T.B.,**

v.

**CITY OF PHILADELPHIA; Department of Human Service; Wayne Gregory; Maxine Tucker; Joan Reeves; Thomas Cieslinski; Women's Christian Alliance; Mary Barksdale; Irving Ford; Marva Rountree; S. Robinson; Sandra Lewis; Jenlene Jones; Constance Savage; Naomi Byrd; Lisa Kerwin Mary Barksdale, Appellant,**

**M.B., A Minor, by and Through Her Parent and Natural Guardian, T.B.,**

v.

**City Of Philadelphia; Department of Human Service; Wayne Gregory; Maxine Tucker; Joan Reeves; Thomas Cieslinski; Women's Christian Alliance; Mary Barksdale; Irving Ford; Marva Rountree; S. Robinson; Sandra Lewis; Jenlene Jones; Constance Savage; Naomi Byrd; Lisa Kerwin Marva Rountree, Sandra Lewis, Women's Christian Alliance, Appellants.**

Nos. 03–2846, 03–28709.

United States Court of Appeals, Third Circuit.

Argued June 21, 2004.

Decided April 1, 2005.

---

Robert D. Billet, (Argued), D. Ryan Nussey, Billet & Connor, Philadelphia, PA, for Appellant, Women's Christian Alliance, Sandra Lewis and Marva Rountree.

Philip B. Silverman, Steven N. Cherry, (Argued), Mintzer, Sarowitz, Zeris Ledva & Meyers, Philadelphia, PA, for Appellant, Mary Barksdale.

Leonard V. Fodera, (Argued), John R. Trotman, Monheit, Silverman & Fodera, P.C., Philadelphia, PA, for Appellee.

Before NYGAARD, MCKEE and CHERTOFF,* Circuit Judges.

## OPINION OF THE COURT

MCKEE, Circuit Judge.

The defendants appeal a jury verdict in the amount of $2.8 million in favor of plaintiff on a claim arising out of the foster care placement of her minor child, "M.B." For the reasons that follow, we will affirm.

## I. FACTS

Mary Barksdale is a 76 year old widow who lives in Philadelphia, Pennsylvania. The Women's Christian Alliance ("WCA") is a social services agency licensed by the Commonwealth of Pennsylvania and under contract with the City of Philadelphia. Pursuant to that contract, the WCA assists the City in placing children in foster care when parental custody has been suspended or terminated. In her capacity as a foster parent, Barksdale has raised many foster children in cooperation with the City and the WCA.

"M.B." was born in 1992, and lived with her biological mother, "T.B.," for the first several months of her life. The Juvenile Court eventually removed M.B. from T.B.'s custody because of the latter's mental illness and neglect. Pursuant to its contract with the Philadelphia Department of Human Services ("DHS"), the WCA accepted M.B. into foster care and she was placed with Barksdale in September 1993. She remained in Barksdale's custody through August 1994, when T.B. regained custody.

Problems with T.B.'s care of M.B. developed again in the summer of 1995, and M.B. was once again placed with Barksdale in September 1995. M.B. remained in Barksdale's foster home until September 1996.[1]

---

* Judge Chertoff heard oral argument in this case but resigned prior to the time the opinion was filed. The opinion is filed by a quorum of the panel. 28 U.S.C. §§ 46(d).

1. M.B. exhibited difficult behavior patterns on both placements with Barksdale, and Barksdale utilized various "wraparound" and "respite" professional services to assist with M.B.'s care. Between placements with Barksdale, while M.B. was living with T.B., M.B. was malnourished, and was thought to have been using illegal drugs.

Irving Ford, an adult male son of one of Barksdale's neighbors, was "kicked out" of his father's home and left with no place to stay at some point prior to M.B.'s second placement with Barksdale. Barksdale purportedly felt sorry for Ford and let him sleep on a couch in her basement until he "got on his feet" and found a place to live.

T.B. periodically visited Barksdale during M.B.'s second placement with her. During those visits, T.B. saw Ford and was aware that he was living in Barksdale's basement. In her deposition, T.B. testified that during her visits, M.B. made statements about Ford being her boyfriend, "freak[ing] her", and showing her "porn" books. After these visits, T.B. contacted Wayne Gregory, a DHS employee assigned to M.B.'s case, regarding Ford's presence and M.B.'s comments. T.B. testified that she also informed Thomas Cieslinsk, Gregory's supervisor, of her concerns. D.H.S. employees subsequently told T.B. that Ford did not live with Barksdale.

At the beginning of May 1996, while bathing M.B., Barksdale noticed that M.B. appeared to have developed several "bumps" in her genital area. Barksdale informed the respite worker who was assisting her, and the respite worker sought medical attention for M.B. Thereafter, M.B. was diagnosed with the Human Papilloma Virus [2] ("HPV"), and genital warts, and subsequently underwent a colposcopy.[3] Although M.B. denied having been "touched" by anyone, a "CY–47" report of suspected abuse was filed.

DHS conducted two investigations after learning of M.B.'s condition. In the first investigation, conducted in 1996, Investigator Emory Ellis concluded that the claim of sexual abuse could not be substantiated. In the second, conducted in 1997, Ellis found that there was substantial evidence of sexual abuse.

Barksdale claimed that Marva Rountree, a WCA caseworker, knew of Ford's presence in her home. According to Barksdale, Rountree saw Ford there and spoke to him on various visits she had made to Barksdale's home prior to, and during, M.B.'s stay there.[4] The WCA admitted that caseworkers had seen Ford in Mrs. Barksdale's home, but denied knowing that Ford lived there. Since Ford was known as a neighbor who was sometimes paid for

2. According to the website of the American Social Health Association:

 Human papilloma virus is one of the most common [sexually transmitted diseases]. An estimated 40 million Americans are infected with HPV, with 1 million new cases each year. HPV is the name of a group containing more than 80 different types of viruses. Certain types of HPV cause warts on the hands or feet, while others can cause genital warts on the vulva, vagina, anus, cervix, penis or scrotum. These may be raised or flat, single or multiple, small or large. Some cluster together; some can't be seen by the naked eye (subclinical infection). Often flesh-colored and painless, genital warts only rarely cause symptoms such as itching, pain or bleeding. HPV and genital warts are usually spread by direct, skin-to-skin contact during sex. Warts might appear within several weeks after sex with an infected person, they might take months to appear or they might never appear. Very little is known about the transmission of subclinical HPV infection. http://www.ashastd.org/stdfaqs/glossaryei.html# h_lc.

3. "Colposcopy is a procedure in which the doctor uses a special microscope (colposcope) to look into the vagina and cervix. It is used to find abnormal parts of the cervix and take a sample to figure out how to treat them." http://lib-sh.lsumc.edu/fammed/pted/colpopre.html

4. Rountree testified in her deposition, which was admitted at trial, that she had seen Ford at Mrs. Barksdale's home 7 or 8 times before M.B. was placed there and saw him 2 or 3 times after the placement.

doing chores in the neighborhood, the WCA purportedly believed that he was only occasionally present in Barksdale's home. Accordingly, the WCA maintains that it had no knowledge that he was actually living in the Barksdale home while M.B. was there.

Barksdale denied knowing that Ford was performing any sexual acts upon M.B. or being involved in any improper touching. Barksdale also denied allowing Ford unsupervised access to M.B., and she testified that she was unaware that he was smoking crack cocaine in her home.

However, Ford was ousted in 2001, for rape and related charges. He thereafter pled guilty to sexual assault, indecent assault and corruption of the morals of a minor based upon complaints that he had molested M.B. in Barksdale's home. During the course of his guilty plea colloquy the following exchange occurred:

ASSISTANT DISTRICT ATTORNEY: Judge, a summary of the facts that the Commonwealth would present, we would first call [M.B.].... She would testify that back when she was four years old she was living in foster care with [Mrs. Barksdale]. That at the time she was living with Ms. Barksdale the defendant, who she would identify as Erving [sic] Ford, ... had a space down the basement of Ms. Barksdale's house. She would testify that during the time that [M.B] was there the defendant would come upstairs ... remove her clothing and touch her body, and he did at some point in time place his penis inside her vagina. The testimony would also indicate, Your Honor, that subsequent to that date back in 1997 the complaining witness was treated at Chil-dren's Hospital and genital warts were surgically removed for the child.... [I]n ... 2000 [M.B.] ... made the disclosures as to what Mr. Ford had done to her ... back when she was between three and four years old.... We would have further presented medical testimony to show that the genital warts that the child had were contracted through sexual contact.

THE COURT: Okay. You hear those facts?

FORD: Yes, sir.

THE COURT: Are they substantially correct?

\*　　\*　　\*　　\*　　\*　　\*

FORD: Yeah.

However, when he was subsequently deposed, Ford denied committing the acts he had admitted during his guilty plea colloquy. Rather, he claimed that he had been pressured into pleading guilty by his court-appointed attorney who allegedly demanded that Ford plead guilty despite his protestations of innocence.[5]

As Barksdale points out, the frequency, location and nature of M.B.'s abuse remains unclear. No one witnessed Ford's molestation of M.B., and Barksdale continues to argue that, if M.B. was sexually abused, it occurred sometime between August 1994 and August 1995, when M.B. was living with her mother.

The WCA echoes Barksdale's argument and adds that there is no evidence that Ford has HPV or that he transmitted it to M.B. Ford has never been tested, no medical records indicate that he has HPV and he denies having the disease. The WCA argues that, since the incubation of the

---

5. During the change of plea colloquy Ford told the sentencing court that he was satisfied with defense counsel.

HPV virus is unknown, and since an infected individual can remain asymptomatic for years with no sign of infection at all, M.B.'s diagnosis of HPV in May 1996, only establishes that M.B. was exposed to it at some point. However, argues the WCA, the exposure could have occurred at any point in her life, or even during her gestation, and M.B.'s infection therefore cannot be traced to her stay in Barksdale's foster care.

## II. PROCEDURAL HISTORY

T.B. filed the instant action in the Court of Common Pleas as M.B.'s guardian. She sued the City of Philadelphia, DHS, and certain DHS employees under 42 U.S.C. § 1983.[6] The suit was thereafter removed to federal court and the complaint was amended to add various causes of action under state law and intentional state law tort claims against Irving Ford.

The state law claims against Barksdale, the WCA, and the WCA's employees were all based on negligence.

The district court thereafter granted summary judgment in favor of the City because T.B. had not established municipal liability under *Monell v. City of New York Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). However, the court ruled that genuine issues of material fact existed as to WCA's knowledge of Ford's presence in the Barksdale home and his access to, and contact with,

M.B. *M.B. v. City of Philadelphia,* 2002 WL 733879 (E.D.Pa. March 3, 2003).

M.B. thereafter settled all claims except her state law claims against Ford, Barksdale, the WCA and its employees. The district court exercised supplemental jurisdiction over those claims pursuant to 28 U.S.C. § 1367(c). After the district court resolved several *in limine* motions, the remaining claims proceeded to trial before a jury. At the conclusion of M.B.'s evidence at trial, Barksdale moved for a directed verdict or judgment as a matter of law. The court denied that motion and the jury returned a verdict in favor of M.B. in the amount of $2.8 million. Liability was allocated among the WCA, Barksdale, Ford and various WCA employees. Barksdale and Ford were each found to be 25% responsible.[7] Post verdict motions were denied, *M.B. v. Women's Christian Alliance,* 2003 WL 21384836 (E.D.Pa. June 16, 2003), and these consolidated appeals followed.

## II. DISCUSSION

Barksdale and the WCA make a number of arguments in support of their appeals. We consider each separately:

### A. Admission of Ford's guilty plea.

■ Both the WCA and Barksdale challenge the preclusive effect the district court afforded Ford's guilty plea during the trial of their state law claims. In their joint motion *in limine*, Barksdale and the

---

**6.** The § 1983 action was based on the state-created danger theory of liability under which liability can be imposed upon a state actor if the state actor plays a role in the creation of the danger the plaintiff is subjected to. In *Kneipp v. Tedder,* 95 F.3d 1199, 1208 (3d Cir.1996), we recognized the state-created danger theory of § 1983 liability, holding that a plaintiff must prove four elements: (1) the harm ultimately caused was foreseeable and fairly direct; (2) the state actor acted in will-

ful disregard for the safety of the plaintiff; (3) there existed some relationship between the state and the plaintiff; and (4) the state actors used their authority to create an opportunity that otherwise would not have existed for the injury to occur.

**7.** The court thereafter molded the verdict against one of WCA's employees, Melva Rountree, into the judgment against the WCA.

WCA asked the district court for a ruling that Ford's guilty plea "does not have collateral estoppel effect in this case, is not conclusive, and shall be treated [only] as an admission against interest on the part of Irving Ford." The court denied that motion in an order dated March 4, 2003, in which the court held, *inter alia:*

> b. The fact of Irving Ford's guilty plea and the guilty plea colloquy of Irving Ford, dated October 15, 2001, are admissible in evidence at trial against Defendant Irving Ford only.
>
> c. The guilty plea and guilty plea colloquy are conclusive evidence that Defendant Ford committed the acts admitted to therein. Defendants are precluded from presenting evidence on the issue of whether these acts were committed.
>
> d. An appropriate limiting instruction will be given to the jury regarding the non-conclusive effect of the guilty plea against the other defendants in proving elements of the claims against them such as knowledge or deliberate indifference.[8]

In their respective appeals, the WCA and Barksdale make separate but related arguments that they are entitled to a new trial because of that ruling. We review the district court's decision to admit evidence for abuse of discretion. *Ansell v. Green Acres Constr. Co.,* 347 F.3d 515, 519 (3d Cir.2003).

The WCA and Barksdale rely in part upon the general presumption against allowing a guilty plea to collaterally estop related evidence in a subsequent civil action. In determining the collateral estoppel effect of a prior state court criminal proceeding, we look to the law of the state where the criminal proceeding took place. *Anela v. City of Wildwood,* 790 F.2d 1063, 1068 (3d Cir.1986). Pennsylvania allows collateral estoppel if:

> (1) the issue decided in the prior case is identical to one presented in the later case; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party in the prior case; (4) the party or person privy to the party against whom the doctrine is asserted had a full and fair opportunity to litigate the issue in the prior proceeding; and (5) the determination in the prior proceeding was essential to the judgment.

*Stidham v. Millville Sportsmen's Club,* 421 Pa.Super. 548, 618 A.2d 945, 954 (1992). Appellants claim that we have held that a guilty plea should not result in estoppel because it does not rest on an actual adjudication or determination of any issue. They rely in large part upon *Bower v. O'Hara,* 759 F.2d 1117 (3d Cir.1985);

---

**8.** The district court gave the following limiting instruction to the jury:

> Now, you have heard during the trial that on October 15, 2001, the defendant Erving (sic) Ford pled guilty to the criminal charges of statutory sexual assault, indecent assault and corrupting the morals of a minor.
>
> You may not consider the fact of Mr. Ford's guilty plea as determinative on the liability of any of the other defendants in this case.
>
> In other words, even though it is conclusively established the Erving (sic) Ford committed the act or acts that he admitted, to recover against any of the other defendants in this matter the plaintiff must still prove each and all of the required elements of her claims against the other defendants as I will further instruct you.
>
> You are specifically instructed that you are not permitted to consider Mr. Ford (sic) guilty plea in determining whether the other defendants were aware of him performing the acts to which he pled guilty.

The WCA and Mrs. Barksdale did not object to the limiting instruction in the district court and do not challenge it here in their appeals.

*Anela v. City of Wildwood,* 790 F.2d 1063 (3d Cir.1986); and *Linnen v. Armainis,* 991 F.2d 1102 (3d Cir.1993).

In *Bower v. O'Hara,* we held that O'Hara was not estopped from raising a self-defense claim because that issue had not been "actually litigated" when he previously pled guilty to assaulting Bower. 759 F.2d at 1126. We reasoned that collateral estoppel (or issue preclusion) was designed to prevent unnecessary relitigation of issues actually litigated and determined. *Id.* at 1125. However, since a guilty plea, has never been the subject of an "adversary contest leading to a judicial determination," it should not be accorded total preclusive effect. *Id.* We concluded that, although the plea may constitute evidence against the defendant in later proceedings, the defendant should still have an opportunity to contest relevant facts. *Id.* at 1126.

Similarly, in *Anela v. City of Wildwood,* six young women pled guilty to violating a resort town's anti-nose ordinance. Thereafter, they filed a § 1983 suit against the town and various municipal officials asserting, *inter alia,* that they were arrested without probable cause in violation of the Fourth Amendment. *Id.* at 1068. We held that the women were not collaterally estopped from raising the Fourth Amendment claim in the § 1983 action because their guilty pleas were "to a non-indictable offense where the Fourth Amendment issues of fact were never subjected to an adversary contest leading to a judicial determination." *Id.* at 1069.

Finally, in *Linnen v. Armainis,* Linnen was charged with various violations of a state's drug and weapon's laws. Although he was represented by counsel, he filed a *pro se* suppression motion, but he pled guilty to the charges before the motion was decided. It was undisputed that if he "had been successful in suppressing the evidence ... he would have had a complete defense to the possessory offenses charged against him in the state criminal case." *Id.* at 1103.

His conviction and sentence were affirmed, and he thereafter unsuccessfully filed for relief under the state's post-conviction relief act. He appealed to the state's intermediate appellate court, but while the appeal was pending, he filed a § 1983 action against the arresting officers. That civil rights action claimed that police violated his Fourth Amendment rights in seizing the evidence that resulted in his criminal conviction. The district court held that he was collaterally estopped from bringing the § 1983 action because he could have litigated the constitutionality of the search in a suppression hearing, but failed to do so. We reversed because the legality of the search had never been determined by the state court.

Appellants argue that Ford's responsibility for any sexual assault M.B. may have suffered has not been determined because it was never litigated, and his contend guilty plea should therefore not have preclusive effect in M.B.'s suit against them. However, their arguments diverge from there.

The WCA argues that since there can be no estoppel, judgment can not be entered on the basis of Ford's guilty plea alone. Therefore, argues the WCA, absent evidence to corroborate the criminal acts Ford conceded during his guilty plea colloquy, neither his statements there nor his plea can be admitted to establish the WCA's liability. However, that argument ignores the totality of evidence that was admitted in the district court.

Morever, under Pennsylvania law, "a conviction from a guilty plea is equivalent to a conviction from a trial-by-jury," *DiJoseph v. Vuotto,* 968 F.Supp. 244, 247 (E.D.Pa.1997) (citing *Commonwealth Dept.*

of Transportation v. Mitchell, 517 Pa. 203, 535 A.2d 581, 585 (1987)), because a guilty plea constitutes an admission to all facts alleged in the indictment. *Commonwealth Dept. of Transportation v. Mitchell,* 535 A.2d at 585. In *Mitchell,* the Pennsylvania Supreme Court held that summary judgment may be granted in a civil proceeding based upon a guilty plea in a criminal case if the operative facts in the criminal case are identical to those that would be litigated in a civil case. Furthermore, in Pennsylvania, "criminal convictions are admissible in civil actions arising from the same operative facts and circumstances [and] these convictions are conclusive evidence of the criminal acts." *Stidham v. Millvale Sportsmen's Club,* 421 Pa.Super. 548, 618 A.2d 945, 952 (1993).

The operative facts in Ford's criminal case mirror the facts that would support the WCA's liability to M.B. Ford's admissions establish not only that he had access to her, but that he used that access to sexually assault her after the WCA placed her in foster care. Moreover, the jury could conclude from evidence it heard about WCA employees seeing Ford in Barksdale's home that the WCA had reason to suspect that the placement exposed M.B. to Ford. Yet, the WCA apparently made few if any inquiries into Ford's background or circumstances. Whether or not the WCA knew Ford was living there, the jury clearly could have concluded that WCA employees knew enough to realize he had access to M.B. The fact that they may not have known the full extent of Ford's access to M.B. would not undermine the jury's determination of liability. Therefore, we are unconvinced by the WCA's attempt to require evidence to corroborate the admissions Ford made during his change of plea colloquy.

Barksdale relies upon a different argument. She concedes that Ford's guilty plea was admissible against him. However, she relies upon *Bower, Anela* and *Linnen,* to argue that the district court erred by holding that she was precluded from challenging whether Ford actually committed the acts he admitted. More specifically, Barksdale argues that she was collaterally estopped from introducing evidence that Ford had given statements prior to being criminally charged in which he denied molesting M.B. She also argues that she was prevented from introducing the denials he made during his deposition as well as the explanations he offered there stating that he was pressured into pleading guilty to avoid spending up to twenty years in prison. In other words, Barksdale argues that the district court erred in not allowing her to introduce evidence that Ford was innocent of the crimes he admitted during his guilty plea colloquy. We are not persuaded by Barksdale's argument.

Initially, we have serious doubts about the applicability of *Bower* and *Anela. Bower* was a Virgin Island's case, and our analysis was therefore predicated on the Restatement, *see* Restatement (Second) of Judgments, § 27, as required by V.I.Code Ann. tit. 1, § 4. Here, we are not construing the Restatement. Similarly, *Anela* was decided on the basis of New Jersey law as set forth in *Matter of Tanelli,* 477 A.2d 394 (N.J.Super.Ct.App.Div.1984). There, the court held that guilty pleas to inconsequential non-indictable offenses cannot collaterally estop one who pleads guilty from instituting a civil suit because guilty pleas in such cases are used to informally adjudicate matters that are not deemed to be very serious.[9] Given the

---

**9.** We also noted in *Anela* that the state appellate court's decision in *Tanelli* was consistent with our interpretation of the Restatement

severe nature of the charges against Ford, *Matter of Tanelli* is simply not implicated here.

We agree that *Linnen* does support Barksdale's position.[10] However, the collateral effect of the guilty plea there was being asserted against the person who actually pled guilty to the crime. That is not our case. Ford is not arguing that his guilty plea should not have preclusive effect, Barksdale is. However, she is unable to offer any authority to support her argument that a civil defendant who did not plead guilty to the crime which is the foundation of the civil action can demon-

strate that her civil co-defendant's guilty plea does not have a preclusive effect.[11] Barksdale's claim, if accepted, would unravel a well-established principle of Pennsylvania law. As we have noted above, under Pennsylvania law, a guilty plea constitutes an admission to all of the facts alleged in the indictment. *Mitchell*, 535 A.2d at 585.

Moreover, we think that the entire argument about Ford's guilty plea is the proverbial "red-herring." M.B.'s claims sound in negligence. The district court's order specifically permitted Appellants to introduce evidence that they exercised reasonable care. The court provided: "An ap-

---

(Second) of Judgments in *Bower.* 790 F.2d at 1068.

**10.** *Linnen* was decided before the Supreme Court adopted the "favorable termination rule" in *Heck v. Humphrey*, 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). However, the Court did recognize that a § 1983 claim for damages because of an unlawful search does not necessarily impeach the criminal conviction resulting from the search. *Id.* at 487 n. 7, 114 S.Ct. 2364. *Linnen's* discussion of the availability of a § 1983 action must be read in light of *Heck.*

**11.** At first glance, *Stidham v. Millvale Sportsmen's Club*, 421 Pa.Super. 548, 618 A.2d 945 (1993), lends some support to Barksdale's argument that she should be able to avoid the preclusive effect of Ford's guilty plea. There, McLaughlin suffered from alcoholic blackouts, when he drank to excess. He would thus have no conscious awareness or memory of his actions. After drinking in a bar and the sportsmen's club, he shot and killed Stidham during a blackout. Ultimately, he pleaded guilty to third degree murder.

At the time he killed Stidham, McLaughlin was insured under a homeowner's policy issued by Aetna, which contained a bodily injury limit of liability of $50,000, and contained the standard exclusion for injuries which are "expected or intended" by the insured. *Id.* at 948. Stidham's administratrix filed a wrongful death and survival action against the bar and the sporstmen's club, both of whom, joined McLaughlin as an additional defen-

dant. When joined, McLaughlin had already pleaded guilty to third degree murder.

After numerous motions and filings not relevant here, an intermediate appellate court held that the guilty plea, by itself, was not necessarily conclusive proof of "any conscious or knowing action by McLaughlin which would bring his actions within Aetna's policy exclusion." *Id.* at 951. Consequently, it examined the criminal information detailing the charges brought against McLaughlin to determine "just what he admitted by virtue of his guilty plea." *Id.* It concluded by noting that while the plea did establish that McLaughlin shot and killed Stidham, it did "nothing to enlighten us regarding his intent to shoot and kill" Stidham. *Id.* at 953. Accordingly, the appellate court held that while McLaughlin's guilty plea is admissible in the underlying civil action, the plea was "hardly conclusive evidence of McLaughlin's intent thereby operating as a bar to recover under his Aetna's homeowner's policy." *Id.* Therefore, the appellate court held that "[b]ecause McLaughlin's intent remains a material, factual issue, not excluded by Aetna's evidence, summary judgment in favor of Aetna was inappropriate." *Id.*

The administratrix in *Stidham* was not collaterally estopped by McLaughlin's guilty plea because McLaughlin had assigned all of his rights under the homeowner's policy to the administratrix. In other words, the administratrix stood in the shoes of the person who pleaded guilty. Here, however, Mrs. Barksdale does not stand in Ford's shoes.

propriate limiting instruction will be given to the jury regarding the non-conclusive effect of the guilty plea against the other defendants in proving elements of the claims against them such as knowledge or deliberate indifference." As noted, a limiting instruction was given, and no objections were entered. *See* n. 9, *supra.* We assume that the jury understood and followed the limiting instruction. *Rinehimer v. Cemcolift, Inc.,* 292 F.3d 375, 383 (3d Cir.2002).

The district court's ruling also allowed defendants to introduce any evidence of sexual abuse by someone other than Ford or that sexual abuse occurred at a time or place other than that conceded during Ford's colloquy. In fact, one of Barksdale's defenses at trial was that M.B. was sexually abused while M.B. was living with her mother, T.B., between August 1994 and August 1995. The jury heard that argument, and any evidence that was offered to support it, and rejected it. We see no reason to upset the jury's assessment of that defense.

### B. Failure to grant judgment as a matter of law or a new trial to Barksdale.

Barksdale argues that the district court erred in denying her motions for judgment as a matter of law and for a new trial for reasons not related to the motion *in limine.*

#### (1). Judgment as a matter of law.

■ Judgment as a matter of law can only be granted when there is no legally sufficient basis for a reasonable jury to find for the nonmoving party. *Gomez v. Allegheny Health Srvs., Inc.,* 71 F.3d 1079, 1083 (3d Cir.1995). If the record contains even the minimum quantum of evidence necessary to support a verdict, the verdict must be sustained. *Parkway Garage, Inc.*

*v. City of Philadelphia,* 5 F.3d 685, 691 (3d Cir.1993) (citation and internal quotations omitted). Our review of the district court's order denying a new trial and refusing judgment as a matter of law is plenary. *Wittekamp v. Gulf & Western, Inc.,* 991 F.2d 1137, 1141 (3d Cir.1993).

Barksdale argues that she should have been granted judgment as a matter of law because a reasonable jury could not have found her liable based upon the evidence. She claims that M.B. maintains she was negligent in failing to inform the WCA of Ford's presence in her home, and in failing to properly supervise M.B. However, according to Barksdale, M.B. produced no evidence of any such negligence. M.B. did not testify, and no one witnessed any instances of sexual abuse in Barksdale's home. She also points to the absence of any evidence that: 1) she allowed Ford close contact with, or unsupervised access to, M.B.; 2) that she was ever aware or should have ever been aware, that Ford was molesting M.B.; or that, 3) she was aware of any proclivity Ford may have had to molest children. Barksdale concludes that there is therefore no evidence that she breached a duty to M.B.

Barksdale also contends that there was insufficient evidence of causation because, even if she was negligent in not informing the WCA, their employees knew Ford was at least a frequent visitor prior to M.B.'s second placement in Barksdale's home. Barksdale points to testimony from the WCA's own employees that the WCA had a duty to perform a background check on Ford under those circumstances. Given that evidence, Barksdale claims that it was not necessary for her to inform the WCA about Ford's presence, because the WCA clearly knew.

However, there was evidence from which the jury could conclude that Barksdale permitted Ford to live in her home in

violation of foster care regulations. Moreover, it appears that Barksdale never bothered to inquire why Ford, an admitted crack addict, was not allowed to live in his own home. We realize that Barksdale denied knowing that Ford was a crack addict. However, testimony from Ford's deposition, if accepted by the jury, would have established that Barksdale knew of his addiction and that he was using cocaine while living with Barksdale. The jury also heard testimony from Ford's deposition in which he stated that M.B. was permitted to play in Barksdale's basement with no supervision "millions of times." Given such testimony, a reasonable juror could well conclude that Barksdale was negligent, and that her failure to properly supervise M.B. presented Ford with an opportunity to molest her.

Furthermore, we reject Barksdale's claim that the WCA's knowledge of Ford's presence somehow exonerates Barksdale in this tragic affair. One defendant's negligence does not necessarily negate another defendant's negligence. *See, e.g., Piekarski v. Club Overlook Estates, Inc.,* 281 Pa.Super. 162, 421 A.2d 1198, 1297 (1980). We need not explore the subtleties of tort law to realize that the WCA's negligence would not excuse Barksdale's failure to use reasonable care. She was, after all, the foster parent responsible for the care and custody of M.B. M.B. was living in Barksdale's home and, regardless of any knowledge the WCA may have had, Barksdale clearly knew that Ford had unsupervised access to her.

#### (2). Motion for new trial.

■ A new trial may be granted where "the verdict is contrary to the great weight of the evidence." *Roebuck v. Drexel Univ.,* 852 F.2d 715, 735 (3d Cir.1988). However, the trial court's discretion to order a new trial is narrow. *Klein v.*

*Hollings,* 992 F.2d 1285, 1290 (3d cir.1993). The district court cannot substitute its view of the facts and credibility of the witnesses for that of the jury. *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 211 (3d Cir.1992). Thus, a district court should grant a new trial "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Williamson v. Consolidated Rail Corp.,* 926 F.2d 1344, 1353 (3d Cir. 1991) (citation omitted).

Barksdale argues that she is entitled to a new trial because there is no rational basis for finding her 25% responsible for M.B.'s damages; the same proportion attributed to Ford. Barksdale claims that charging her with the same level of culpability as Ford "shocks the conscience" and therefore entitles her to a new trial. We disagree.

Reasonable minds can certainly disagree about whether Barksdale and Ford are equally responsible for what happened. However, given her role as the foster parent ultimately responsible for M.B.'s well being and safety, a determination that she was equally responsible does not "shock the conscience."

#### C. Unrelated allegations of sexual abuse.

■ Appellants argue that M.B's counsel improperly referred to allegations that another child who had been placed in Barksdale's foster care had also been abused and that unfair prejudice resulted that can only be remedied with a new trial.

The district court granted Appellants' motion *in limine* insofar as they requested that this evidence be excluded. However, on the first day of trial, while questioning a witness, M.B.'s counsel referred to another child who had alleged been sexually

abused while in Barksdale's foster care. Sandra Lewis, a case worker supervisor for the WCA was also a defendant. The following exchange occurred while she was discussing a "CY–47" form that is filed to report allegations to a child abuse hotline:

> [M.B.'s counsel]: Nobody from WCA bothered to call [the child abuse hotline] throughout the month of May, did they?
>
> [Sandra Lewis]: I can't remember.
>
> Q: Well, if there was, there would be a CY–47, wouldn't there?
>
> A: A CY–47 was filed and it was unfounded.
>
> Q: The CY–47 is from April, April 15, 1997.
>
> A: That wasn't the initial CY–47.
>
> Q: The CY—you're absolutely right, ma'am and we haven't introduced that into evidence because—and I'm not going to testify here. But isn't it true that that CY–47 was not for an incident with [M.B.], but for another child in the foster home?
>
> A: Yes.
>
> Q: Another child who had been—

App. 427 (emphasis added). Both counsel then objected, and the court explained that "[i]t had nothing to do with this plaintiff." In denying their motion for a new trial, the district court explained:

> [R]egardless of whether the question was improper, the Court stopped the line of questioning and further testimony on the topic and instructed the jury that "it had nothing to do with this plaintiff." As the reference was isolated, I cannot conclude that it was reasonably probable, after three more days of additional testimony, that this brief reference influenced the verdict.

*M.B. v. Women's Christian Alliance*, 2003 WL 21384836 at *4 (E.D.Pa. June 16, 2003). We agree.

Appellants argue that this improper reference to another allegation of the sexual abuse of a child in Barksdale's care was highly prejudicial and improperly influenced the jury. They refer to an affidavit submitted by Barksdale's counsel in which counsel states that during a discussion with jurors after the trial, one juror "specifically mentioned" recalling testimony regarding allegations of abuse regarding other children and that she thought that there were "other things going on" at the house the jury was not hearing. The district court refused to consider that affidavit in denying a motion for a new trial. The court explained its reluctance explaining that it "is well-settled that a trial court may not consider statements, even those that are volunteered, from jurors regarding their 'decisional processes' when deciding a motion for a new trial." 2003 WL 21384836 at *3 n. 5.

Although Appellants contend that the affidavit shows that the reference was prejudicial, they do not argue that the district court erred by not considering it. Similarly, they do not now argue that we should consider it.

We agree that trial counsel's reference to these other allegations violated the district court's pretrial ruling, and that the reference was improper. However, the district court has correctly explained why it does not merit the relief Appellants seek, and we can add little to that explanation.[12]

### D. Evidence of Ford's drug use.

 In her motion *in limine*, Barksdale argued the court should exclude evidence

---

**12.** "A new trial may be granted only where the improper statements made it 'reasonably probable' that the verdict was influenced by prejudicial statements." *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 363–64 (3d Cir.1999) (citation omitted).

of Ford's drug use in her home and evidence of the price of crack cocaine. The district court denied that request, and the jury heard testimony from Ford's deposition wherein he admitted smoking crack in her basement. On one such occasion, he purportedly extinguished a lit crack pipe leaving crack smoke lingering in the air immediately before Barksdale entered the basement. The jury also heard that Barksdale knew that Ford was on probation for a drug offense and in a rehabilitation program for drug use.

Barksdale argues that evidence of Ford's drug use in her home is not relevant to the issue of whether she knew or should have known that Ford was going to or did sexually abuse M.B.[13] Therefore, she contends the district court's denial of her motion *in limine* was an abuse of discretion warranting a new trial.

We will certainly assume *arguendo* that one who smokes crack or is involved in drug rehab is no more likely to molest a minor child than one who isn't. Nevertheless, Barksdale's argument woefully misses the point. Evidence of Barksdale's knowledge of Ford's drug use is relevant to the quality of supervision and care in Barksdale's home. The issue is not whether Barksdale should have known that Ford might molest M.B. because of he used crack. Rather, the issue is whether a jury could conclude that Barksdale breached her duty of care to M.B. by allowing Ford to reside in her home with M.B. under only minimal supervision. As we said in *Kleinknecht v. Gettysburg College*, 989 F.2d 1360 (3d Cir.1993):

> The test of negligence is whether the wrongdoer could have anticipated and foreseen the likelihood of harm to the injured person resulting from his act. The type of foreseeability that determines a duty of care, as opposed to proximate cause, is not dependent upon the foreseeability of a specific event. Instead, in the context of duty, the concept of foreseeability means the likelihood of a general type of risk rather than the likelihood of the occurrence of the precise chain of events leading to the injury.

*Id.* at 1369 (citations and internal quotations omitted).

■ Ford's deposition testimony established that he paid $5.00 for a "rock" of cocaine; the same amount Barksdale paid him for doing odd jobs. Barksdale argues that the price of crack cocaine was totally irrelevant. In her view, the fact that she paid him $5.00 for odd jobs and the fact that crack cost Ford $5.00 is merely coincidence.

Although this evidence was certainly tangential to the issues at trial, Barksdale did testify that she did not know that Ford was using drugs, and that she put him out of her house because he was "going to" use drugs. The jury could consider that along with her paying him an amount equal to the cost of drugs in considering the extent of her knowledge. Moreover, even if we assume that this evidence was irrelevant, Barksdale would still not be entitled to relief. Given the totality of the evidence that was properly admitted, it approaches frivolity to argue that she was unduly prejudiced by evidence about the price Ford paid for crack.

---

**13.** The WCA also argues that evidence of Ford's drug use in Barksdale's home should have been precluded as irrelevant, or pursuant to the balancing test of Fed.R.Evid. 403. However, that argument consists of one paragraph and it does not explain why the evidence was irrelevant or why it should have been excluded under Rule 403. We believe the argument is meritless.

### E. References to Rape.

■ The district court also denied Appellants' attempt to preclude M.B.'s counsel from using the word "rape" at trial. Consequently, throughout the trial, and during argument, M.B.'s counsel characterized Ford's molestation as "rape." Appellants now argue that this unduly prejudiced them and warrants a new trial.[14] The entirety of their argument is as follows:

> The court's ruling permitted plaintiff's counsel to refer to instances of "rape" despite the fact that the rape charge was dropped, and Erving (sic) Ford did not plead guilty to rape. Plaintiff's counsel's reference of "rape" unfairly prejudiced defendants.

To the extent that this argument complies with the requirements of Fed. R.App.P. 28(a)(9), we believe that it is without merit. The jury knew that, during his guilty plea colloquy, Ford admitted that he did "at some point in time place his penis in her vagina." Given M.B.'s age, this clearly constituted statutory rape. Nevertheless, the court told the jury that Ford only pled guilty to statutory sexual assault, indecent assault and corruption of the morals of a minor. The district court also explained that counsel's arguments are not evidence and they were free to reject counsel's reference to evidence during argument to the extent those references differed from their own recollections of the testimony. Consequently, we reject Appellants' efforts to manufacture prejudice from those references.

### F. The Sufficiency of the Evidence that Ford Sexually Assaulted M.B.

■ The WCA also argues that there was insufficient evidence that Ford sexually assaulted M.B. or that she contracted HPV and genital warts from Ford as a result of that sexual assault. The argument has two parts.

First, the WCA says that Ford's guilty plea was insufficient to establish that fact of sexual abuse. We have already disposed of that claim. Second, the WCA says there is no evidence that Ford ever had HPV, or that he transmitted it to M.B. Ford was never tested for HPV and he denies having the disease. The WCA also attacks M.B.'s ob/gyn expert, Robert Gherman, M.D. The WCA claims he started by assuming that Ford molested M.B. and transmitted HPV to her. However, the WCA claims his assumption was not supported by any facts.[15] This is largely because of the latency period for HPV which varies from a few months to several years. It is therefore impossible to determine when M.B. was infected. Moreover, since HPV may be transmitted perinatally, the WCA argues that M.B.'s mother may even have transmitted the infection to her.

We are not persuaded. The WCA ignores a report of its own medical expert, Michael N. Braffman, M.D. Braffman opined that M.B.'s "sexual molestation by Mr. Irving Ford … may be the most apparent cause of M.B.'s [genital wart and HPV] infection." That is hardly a remarkable conclusion. It does little more than state the obvious. However, in his deposition, Braffman went even further. There,

---

14. Pursuant to Fed.R.App.P. 28(i), Mrs. Barksdale adopted by reference the WCA's argument on this point.

15. The WCA claims that it challenged Gherman's report in a *Daubert* motion *in limine,* but that it was denied. However, M.B. says

that the WCA voluntarily withdrew its *Daubert* motion before it was ruled upon by the district court. In addition, says M.B., the WCA did not call its own medical expert, Michael N. Braffman, M.D., at trial to refute Gherman's methodology and conclusions.

he stated that Ford was the most obvious source of M.B.'s infection.

Perhaps in recognition of what Braffman would say at trial, the WCA decided not to call him as a witness. Nothing on this record suggests that anyone other than Ford infected M.B. or that she was infected while in someone else's custody.

### G. Refusal to Allow Defense Witness to Refresh Recollection.

Andrea Bartolo was the WCA's social services expert. Counsel for the WCA attempted to refresh her recollection by reading WCA–817. That was a copy of a document the WCA used to notify DHS of M.B.'s condition. We need not discuss this contention in any detail. Even if we assume that the court erred in not allowing Bartolo to refer to the document, another WCA witness, Sandra Lewis, testified about the same document. Therefore, the jury knew that the WCA had reported M.B.'s condition to DHS.

### H. Expert Testimony on Trauma.

■ M.B.'s experts included Dr. Laurentine Fromm, a child psychiatrist, and Dr. Kathryn Gregoire, a social worker with expertise in the area of child protective services. Dr. Fromm testified that M.B. suffered from post-traumatic stress disorder and attention deficit hyperactivity disorder ("ADHD") and that those conditions were consistent with, or exacerbated by, sexual abuse. She also testified, over the WCA's objection, that M.B.'s symptoms were exacerbated by being left in Mrs. Barksdale's home after being sexually abused.

Dr. Gregiore opined that the WCA breached its standard of care to M.B. by leaving her in Barksdale's home after learning she may have been sexually abused there. She believed that M.B. was further traumatized by remaining where she had been sexually abused.

The WCA argues that it was prejudicial error for the district court to allow the experts to testify regarding the trauma M.B. suffered as a result of remaining in Mrs. Barksdale's home after being sexually abused there. They claim that there was no evidence that M.B. continued to suffer trauma. The WCA also argues that because neither expert's report contained any reference to this, their expert could not properly respond. Therefore, the testimony was prejudicial error warranting a new trial.

It is true that neither expert's report discussed further trauma as a result of M.B. remaining in Mrs. Barksdale's home after the sexual abuse ended. However, we do not believe that the district court abused its discretion by allowing the experts to testify about that.

Dr. Fromm testified that she had interviewed M.B. and reviewed her treatment records. Her expert opinion that continuing trauma resulted from remaining in the home merely elaborated upon her diagnoses of post-traumatic stress disorder and ADHD. *See Hines v. Consolidated Rail Corp.*, 926 F.2d 262, 271 (3d Cir.1991) ("[The expert's] intensive and personal investigation of [plaintiff] distinguishes [the expert's] testimony from the testimony excluded by courts in a number of cases … where there was no evidence in the record that experts ever examined or tested the plaintiff (or assertions) at issue."). The WCA knew from discovery that Dr. Fromm would be testifying about the trauma M.B. suffered, the symptoms of that trauma and explaining the reasons for her expert opinion. Moreover, the WCA can not now complain about not having an opportunity to properly respond because it never called its own expert, Steven Samu-

el, Ph.D., to attempt to rebut Dr. Fromm's testimony.

Similarly, Dr. Gregiore's testimony about M.B. remaining there was merely an extension of his testimony about the appropriate standard of care.

### I. Jury instruction.

■ Appellants argue that the district court's jury instruction was misleading and confusing because it did not adequately explain that Ford's conduct could be considered a superceding cause.[16]

They maintain that the court should have given the following superseding cause instruction instead:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a crime.[17]

Admittedly, the district court's instruction did not explicitly inform the jury about the concept of superseding cause. However, the district court did instruct the jury that the WCA and Barksdale could not be liable unless their negligence was a substantial contributing factor of M.B.'s injuries. The court instructed:

> It has already been determined that Erving (sic) Ford committed criminal acts against [M.B.]. In order for the plaintiff to recover against defendant ... plaintiff must prove that ... Ford's conduct was a substantial contributing factor in bringing about [M.B.'s] injury.

> Likewise, in order to recover against [the WCA and Barksdale] the plaintiff must prove that these defendants were negligent and that their negligent conduct was a substantial contributing factor in bringing about plaintiff's injuries.

> That is what the law recognizes as legal cause. A substantial contributing factor is an actual, real factor although the result may be unusual or unexpected but it is not an imaginary or fanciful factor having no connection or only an insignificant connection with the plaintiff's injuries.

> Accordingly, even if you find that the acts or omissions of [WCA and Barksdale] were negligent if their conduct was not a substantial contributing factor in causing [M.B.'s] injury then your verdict must be in favor of [WCA and Barksdale]. (emphasis added).

This adequately informed the jury that Ford's actions might be a superseding cause.

---

**16.** "Our review of a trial court's jury instructions is plenary. When we assess jury instructions we must look at the totality of the charge given to the jury, not merely a particular paragraph or sentence. We review jury instructions to determine whether, if taken as a whole, they properly apprised the jury of the issues and the applicable law. The trial court should be reversed only if the instruction was capable of confusing and thereby misleading the jury." *Dressler v. Busch Entertainment Corp.*, 143 F.3d 778, 780 (3d Cir.1998) (citations and internal quotations omitted).

**17.** This superseding cause charge is taken from *Ford v. Jeffries*, 474 Pa. 588, 379 A.2d 111, 115 (1977), and is simply a recitation of Restatement (Second) of Torts, § 448.

**J. Taxation of costs.**

Following the entry of judgment, M.B. filed a Request for Taxation alleging recoverable costs in the amount of $57,693.50. Barksdale objected to several of the cost items submitted and asked that the district court adjust the costs taxed. When these appeals were filed, the district court had not yet ruled on those objections. Nonetheless, Barksdale now argues in some detail that they should not be allowed. However, since the district court had not ruled on the costs prior to argument, and since we have not been informed of any such ruling thereafter, there is nothing to review.

## IV. CONCLUSION

For all of the above reasons, we will affirm the district court.